SECRET

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RICHARD A. HORN,                  )     CIVIL ACTION NO. 94-1756 (HHG)
                                  )
            Plaintiff,            )
                                  )     FILED UNDER SEAL    FILED
      vs.                         )
                                  )                       DEC 14 1994
FRANKLIN HUDDLE, JR., et al.      )
                                  )              CLERK, U.S. DISTRICT COURT
            Defendants.           )                 DISTRICT OF COLUMBIA

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS AND/OR FOR SUMMARY JUDGMENT; PLAINTIFF'S
MOTION PURSUANT TO RULE 56(f) OF THE FEDERAL RULES OF
CIVIL PROCEDURE, REQUESTING A CONTINUANCE OF THE HEARING
IN ORDER TO CONDUCT DISCOVERY, AND FOR AN ORDER
PERMITTING PLAINTIFF TO CONDUCT DISCOVERY AND REQUEST
FOR ORAL HEARING (LOC. R. 108(f))

I

INTRODUCTION

Plaintiff's complaint was filed on August 11, 1994.  The
Defendants' answer or responsive pleading was due October 10, 1994.
The first thing the Defendants did was to file an in camera
declaration and not disclose it the Plaintiff, requesting the
entire file be sealed.  That order was granted.  The Government
then sought for and later received an extension of time for one
month to November 10, 1994 in order to file their answer or
responsive pleading, claiming that they needed to interview
witnesses and some of them were outside the Country.  Plaintiff
objected to the extension of time since the Government already had
sixty (60) days, and Plaintiff requested in the interim from the
Defendants' attorney that it be permitted to depose Defendants

23/24

Huddle and Brown, and the Defendants' attorney refused to so
stipulate.

The Defendants then requested a "gag order" requesting
the court to issue an order precluding Plaintiff and his counsel
from discussing the allegations in the complaint with any "third
parties." Plaintiff has filed an opposition to it. The Defendants
desire to preclude Plaintiff from interviewing any witnesses, and
they refused to stipulate to allowing the Plaintiff to depose the
two Defendants, but they filed a motion for summary judgment which
includes the declarations of the two Defendants in question, and
the declarations of two "witnesses."

The Defendants then sought another twenty-two (22) day
extension to December 2, 1994 in which to file an answer or
responsive pleadings, again claiming that the needed to interview
witnesses outside the Country.

On the last day, December 2, 1994 the Defendants have
filed motions to dismiss or in the alternative for summary
judgment. The motions include affidavits of Defendants, the
affidavit of a DEA agent in Rangoon, David B. Sikorra, and the
affidavit of Hugh Price, deputy director for operations for the
Central Intelligence Agency.

Pursuant to Rule 26(d) of the Federal Rules of Civil
Procedure, Plaintiff was not authorized to conduct any discovery
before the parties have met and conferred as required by
Subdivision (f) of Rule 26. Plaintiff's and Defendants' counsel

could not meet and confer pursuant to that rule until after the Defendants filed an answer or a motion, which they did on December 2, 1994.  (Local Rule 206(a).)  Local Rule 207 also precludes the Plaintiff from conducting any discovery in this matter until after the meet and confer requirement of Local Rule 206.

Thus, Plaintiff herein moves for an order pursuant to Rule 56(f) of the Federal Rules of Civil Procedure to either refuse the Defendants' application for a summary judgment, or to continue the matter for a period of at least four (4) months in order to permit the Plaintiff to engage in discovery in this matter.  Plaintiff's Rule 56(f) motion is based upon the attached Declaration of one of Plaintiff's counsel, Brian C. Leighton, and is attached hereto and marked Exhibit "B", and the declaration of Plaintiff Richard Horn, Special Agent, DEA, attached hereto and marked Exhibit "A".

In addition, it is urged that Defendants' motion for summary judgment be denied, based upon the attached Declaration of the Plaintiff, Richard A. Horn (Exhibit "A") which does show that there are material facts with a genuine dispute.  In the event that court disagrees with Plaintiff's assertion herein and in this regard, then Plaintiff respectfully requests a continuance or a denial of the motion based upon Rule 56(f).

As will also be shown below, the Defendants' motion to dismiss must be denied because the Foreign Intelligence Surveillance Act and/or the Omnibus Crime Control and Safe Streets

3

Act does apply to the conduct alleged in the complaint, and Plaintiff's Bivens and conspiracy actions do state claims for which relief can be granted.

II

## BACKGROUND

Richard Horn is an American citizen, has been employed as a special agent for the Drug Enforcement Administration since June of 1971, and has served DEA in management capacities in Pakistan, Des Moines, Iowa, Rangoon, Burma and most recently in New Orleans, Louisiana. Complaint ¶ 8. While stationed in Burma from June of 1992 through September 8, 1993 Horn was the country attaché for DEA with his office located in the American Embassy in Rangoon. During this time, Horn lived at 96 G Inya Road in Rangoon, which residence was U.S. Government leased quarters. Complaint ¶ 8.

While stationed in Burma Horn made substantial progress working in concert with the Burmese government to improve its performance in addressing major drug issues, and Burma is and was the leading opium producing country in the world and is the major source country for the heroin that enters the United States. Complaint ¶¶ 8 and 9. Even though the country of Burma was making substantial progress in its drug law enforcement efforts, Defendant Chargé Huddle was sending reports to the Department of State stating that the government of Burma was not making any progress. Horn strongly encouraged Defendant Huddle to more accurately report on the drug situation in Burma to the policy makers in Washington,

4

and Huddle used the term "intellectual dishonesty" to describe his
type of reporting.  Complaint ¶ 9.  In retaliation for Horn
imploring Huddle to more accurately report what the Burmese
government was doing with respect to narcotic enforcement, Huddle
ordered Horn's removal from Burma over the vigorous protest of DEA
headquarters.  Complaint ¶ 9.  Defendant Brown, being ███████
███████████ for the CIA in Rangoon Burma during this period of time
(Complaint ¶ 3) retaliated against Horn because Horn dutifully
reported Brown to DEA headquarters for Brown's repeated efforts to
undermine and sabotage DEA's anti-drug initiative in that country,
and one such complaint registered by Horn to DEA Headquarters was
where Brown surreptitiously obtained and delivered a sensitive DEA
document, which Brown knew was signed by a DEA informant, to an
official of the government of Burma, with Brown knowing that the
government of Burma would likely engage in some form of retribution
against the informant after seeing the document.  Complaint ¶ 9.

When the International Narcotics Strategy Report
(INCSR), was being prepared by Defendant Huddle, which INCSR
represents the official U.S. Government analysis of the drug
situation in Burma and elsewhere through out the world, Horn
requested to participate in drafting the document, and Huddle
stated that DEA need not be consulted because it is a Department of
State document.  When Horn pressed Huddle to include more accurate
information to create a more credible document, Huddle stated that
the INCSR was "driven by policy, not by facts."  Huddle also stated

that he would not jeopardize his State Department career to merely improve the accuracy of reporting on the drug situation in Burma. Complaint ¶ 12.

Prior to Horn being expelled from Burma by Huddle, Defendant Brown or persons acting under his control intercepted private conversations special agent Horn was having from his residence in Burma to subordinates of special agent Horn and perhaps others. One particular interception occurred on special agent Horn's home telephone and was without Horn's permission and without authority. Complaint ¶ 13. Approximately on August 12, 1993 at approximately 11:00 p.m. Horn called the DEA subordinate (Sikorra) of Horn from Horn's personal residence and had a conversation with [Sikorra] about the fact that Huddle was expelling Horn from Burma and then Horn described DEA headquarters position with respect to such expulsion. The telephone conversation was intercepted and the contents or the tape was made available to Huddle. Within days of the conversation Huddle transmitted the partial contents of said conversation in a cable to Huddle's headquarters in Washington, D.C. and was routed to the attention of several State Department employees. Complaint ¶ 13.

Horn's declaration in support his opposition to the Defendants' motion is attached hereto and marked Exhibit "A".

First, Horn incorporates into his declaration, as though fully set forth, all of the factual allegations contained in ¶ ¶ 8 through 14 of the complaint. (Horn decl. ¶ 16.)

6

Since Horn has been with DEA since June of 1971 he has received numerous awards and letters of commendation, and his annual performance ratings have typically been either excellent or outstanding, and while stationed in Burma, he received an outstanding annual performance rating.  (Horn decl. ¶ 1.)

In August 10 1993 Horn saw a teletype that Horn knew was prepared by Huddle, and he saw this cable within one to two weeks after it was transmitted on August 13, 1993.  The sixth paragraph of Huddle's cable read exactly as follows, including the quotation marks and ellipsis:

> Finally, Horn shows increasing signs of
> evident strain.  Late last night, for example,
> he telephoned his junior agent to say that "I
> am bringing the whole DEA operation down
> here."  "You will be leaving with me...we'll
> all leave together."  In this context, he then
> went on to note talks with Green and Maher
> without explicitly drawing a connection.
> [Horn decl. at ¶ 2.]

After seeing the cable, Horn knew immediately and without question that both the information quoted, and the summarized portion at the end of that paragraph was based upon an electronic intercept.  Horn knew from the cable that it had already been transmitted to the State Department, two different divisions, and sent to the attention of Assistant Secretary Grant Smith and to Thomas Biddick, both with the State Department.  (Horn decl. at ¶ 3.)

Horn saw the cable within days after his conversation with DEA Special Agent Sikorra, and the passage quoted in the cable

7

were exactly and precisely what Horn had said to Sikorra.  (Horn decl. at ¶ 4.)  Horn also knew that Huddle's analysis of his reference to Green and Maher, was based upon several sentences of conversation with Sikorra and that it was "startlingly accurate." (Horn decl. at ¶ 4.)  Mr. Green was then the acting administrator of DEA, and Mr. Maher was the chief of DEA foreign operations, both of whom were strongly supportive of Agent Horn, and they both refused to remove Horn from Burma.  (Horn decl. at ¶ 4.)

Horn knew that when he called Sikorra at approximately 11:00 pm that Sikorra was in bed, that it was impossible for Sikorra to have recorded the conversation or repeated verbatim to any other person, and because the Huddle paragraph in the cable was precisely accurate, Horn knew that it had to have come from an electronic intercept.  (Horn decl. at ¶ 5.)

Horn knew by seeing the data on the cable that Huddle teletyped was drafted and transmitted at approximately 1:35 pm, the very next day after his conversation with Sikorra.  (Horn decl. at ¶ 6.)

Sikorra and Horn lived in government leased quarters that were but two homes of a large pool of homes leased by the United States Government from private parties for the use of American Embassy personnel.  Horn also notes that the telephones in those residences were provided by the U.S. Government and that the U.S. Government paid for both the line installation and the monthly service charge on the telephones.  (Horn decl. at ¶ 7.)

Horn also detected in paragraph 5 of that same cable, the one preceding the quoted portion as mentioned above, that it read exactly as follows:  "Perhaps Horn has been simply responding to orders from DEA Washington (there appeared to be nearly nightly talks) to alter tack but the net result is a sharp loss of creditability."  Horn was surprised to see the reference to his "near nightly" talks because Horn never informed Huddle of the existence of those conversations or the substance of them, nor did he discuss nightly calls with others at the embassy.  (Horn decl. at ¶ 8.)

In paragraph 7 of the same cable, Huddle stated that the State Department should have DEA remove Horn from Burma and if DEA refused Huddle would order Horn's departure.  Horn knows that DEA did refuse to remove Horn, as he was doing an outstanding job, and shortly thereafter over DEA's objection, Huddle ordered Horn's departure.  (Horn decl. at ¶ 9.)

In Horn's declaration, beginning at paragraph 10, he set forth why he believes that Defendant Arthur Brown had the ability to and did conduct the electronic intercepts in question.  In a conversation between Brown and Horn while in Burma, Huddle entered Brown's office and began conversing on another topic.  Brown made some response to Huddle's comments, and when Huddle departed, Brown commented that he sure wished he had a "bug" in Huddle's office right now, and when Horn asked him why he did not, Brown responded

9

(Horn decl. at ¶ 10.)

During the same month, Horn discussed electronic eavesdropping with Brown, wherein Horn asked Brown if his agency had the capability and interest to assist Horn in conducting an electronic telephone intercept (in DEA parlance a Title III, or in CIA parlance a "teletap") on the business phone of a major international trafficker who had an office in Rangoon.

(Horn decl. at ¶ 11.)   Horn then drafted a cable to his headquarters asking them to

(Horn decl. at ¶ 12.)

Approximately February or March of 1993 Horn had a conversation with Brown concerning electronic telephone intercepts, and Brown volunteered

(Horn decl. at ¶ 13.)

In late August or early September 1993 Horn had a conversation with Brown and Huddle wherein Huddle expressed concern that the government of Burma would learn of Horn's pending departure (as a result of Huddle ordering Horn's departure over DEA's objections), and in response to that remark, Brown, suddenly and "totally out-of-synch with the conversation -- blurted out that the GOB probably already knew about my departure because of a 'teletap'." (Horn decl. at ¶ 14.) Horn construed the remark as a virtual admission by Brown, because at that time, Horn had already seen the August 13 cable wherein Horn learned that he had been the subject of an electronic intercept. Horn had already advised

in reference to paragraph 13 above. (Horn decl. at ¶ 14.)

In response to DEA's call for a CIA investigation, he was interviewed by Special Investigator Michael E. Grivsky of the CIA Inspector General's office on June 12, 1994 relative to Horn's various allegations and DEA's allegations of unethical, unprofessional and illegal conduct to include the illegal

intercept, perpetrated by CIA ███████████ Arthur Brown.   Horn

knew that Mr. Maher, Chief of DEA's foreign operations, had

contacted the CIA Inspector General's office regarding the

allegation of an illegal intercept and other offenses.   At one

point during that interview with Grivsky, Grivsky suggested to Horn

"that former Rangoon ███████████ Arthur Brown may very well

have employed a local informant to initiate the illegal intercept

and not gone through official channels or utilized conventional CIA

resources."  (Horn decl. at ¶ 15.)

Grivsky also told Horn that he thought that DEA and Horn

were the agrieved parties in this case, and that something should

be done to make Horn whole, a term advanced by Grivsky.  (Horn

decl. at ¶ 15.)

On July 18, 1994 Horn was also interviewed by an

investigator from the Department of State Inspector General's

office relative to their ongoing criminal investigation on the same

issues.  (Horn decl. at ¶ 15.)

### III

### ARGUMENT

A.   Plaintiff Has Stated A Cause Of Action Under Both The Foreign
     Intelligence Surveillance Act And the Omnibus Crime Control
     And Safe Streets Act

In Count Two of the complaint, Plaintiff contends that

the Defendants are subject to civil liability pursuant to the

Foreign Intelligence Surveillance Act, 50 U.S.C. §§ 1809 and 1810.

In Count Three the Plaintiff contends that the Defendants are

subject to civil liability under the Private Right of Action
contained in 18 U.S.C. § 2520 of Title III of the Omnibus Crime
Control and Safe Streets Act, 18 U.S.C. § 2510 et seq., and alleges
a violation of 18 U.S.C. § 2511.  As will be seen below, either or
both of the statutes apply.

Turning first to Title III of the Omnibus Crime Control
and Safe Streets Act, 18 U.S.C. § 2510 et seq. (Count Three of the
complaint).

The Defendants' first broadside attack (Defendants'
brief, hereinafter "DB", at page 5) is that the Supreme Court has
recently reconfirmed the "well established presumption against the
extraterritorial application of congressional enactments -- citing
*Smith v. United States*, 113 S.Ct. 1178, 1181 (1993), and *EEOC v.
Arabian American Oil Co.*, 499 U.S. 244, 248 (1991).

While the statement made by the Defendants is generally
true, the cases cited by them, and the cases cited within those
cases, do not apply whatsoever to Title 18 U.S.C. § 2510 et seq. --
because the unlawful eavesdropping and the disclosure of the
contents of the intercepted oral communication occurred within the
"possessions" of the United States, the American Embassy in Rangoon
Burma, and U.S. Government leased residence of special agent Horn.

First, the *Smith* case, *supra*, is totally inapplicable,
because there the wife of an United States citizen brought an
action in the District Court in Oregon under the Federal Torts
Claims Act regarding actions that took place in Antarctica.  The

13

Federal Torts Claims Act specifically excluded from the reach of
the act actions that occurred in a foreign country.  Plaintiff,
however contended that Antarctica was not a foreign country because
Antarctica is not under the sovereignty of any country.  The
Supreme Court cited various other reasons why the Federal Torts
Claims Act does not apply to acts in Antarctica, but the primary
point of that case is that congress intended to preclude the FTCA
application to any claim arising in a foreign country.  28 U.S.C. §
2680(k) *Smith*, 113 S.Ct. 1181-1182.

        In *EEOC v. Arabian American Oil Co.*, *Supra*, 499 U.S. 244
(1991) (ARAMCO) the Court was called upon to determine whether or
not Title VII anti-discrimination provisions applied
extraterritorially to regulate employment practices of the United
States corporate employers who employ United States citizens
abroad.  The employer was not a governmental agent, nor did the act
take place within any U.S. governmental possession or territory.
The court looked at the legislative history and stated:

>       "In applying this rule of construction, we
>       look to see whether 'language in the [relevant
>       act] gives any indication of a congressional
>       purpose to extend its coverage beyond places
>       over which the United States has sovereignty
>       or has some measure of legislative control.
>       '*Folley Bros.*, 336 U.S. 281, 285 (1949)"
>       *ARAMCO, supra*, 499 U.S. at 248.  (Emphasis
>       added.)

        The important point in this case is the fact that the
United States Government had virtual plenary control over the
American Embassy in Rangoon, and the U.S. Government leased housing

14

for agent Horn.  This is a far cry from attempting to exert control over an American citizen operating, acting or residing under the exclusive sovereignty of some other country and with respect to a non-government employer.

In *ARAMCO*, the court also discussed its previous case of *Steele v. Bulova Watch Co.*, 344 U.S. 280, 73 S.Ct. 252 (1952), which addressed whether the LANHAM Act, designed to prevent deception and misleading use of trade marks, applied to acts of a U.S. Citizen consummated in Mexico.  The Act had defined commerce as "all commerce which may lawfully be regulated by congress."

> "The stated intent of the statute 'was to regulate commerce within the control of congress by making actionable the deceptive and misleading use of marks in such commerce.' While recognizing that 'the legislation of congress will not extend beyond the boundaries of the United States unless contrary legislative intent appears,' the court concluded that in light of the fact that the allegedly unlawful conduct had some affect within the United States, coupled with the acts 'broad jurisdictional grant' and its 'sweeping reach into "all commerce which may be lawfully regulated by congress"' the statute was properly interpreted as applying abroad.  *Steele, supra*, 344 U.S. at 285, 287, 73 S.Ct. at 255, 256."  *ARAMCO, supra*, 499 U.S. at 252.  See also *Hellenic Lines Ltd. vs. Rhoditis*, 398 U.S. 306, 90 S.Ct. 1731 (1970) (extraterritorial application of the Jones Act); *Kawakitn vs. United States*, 343 U.S. 717, 725 Ct. 950 (1952) (same re treason statute); *Ford vs. United States*, 273 U.S. 593, 602 47 S.Ct. 531, 534 (1927) (National Prohibition Act applied extraterritorially).

Likewise, in this case, paragraph 13 of the complaint points out, the cable containing the intercepted conversation of

15

Horn was routed to the attention of several State Department employees in Washington, D.C., U.S. government equipment was used to transmit that cable, the cable was transmitted from the U.S. Embassy in Rangoon Burma, and the interception took place at Horn's U.S. Government leased residence, while he was in Burma as the Country Attaché for DEA.   Thus, as in *Steele*, but even more so, the conduct alleged in the complaint had far reaching affects within the United States.   Turning to the second aspect, Plaintiff alleges that there is no "extraterritorial" application being requested by the Plaintiff in this case.   Why?   Title 18 U.S.C. § 2511(1) makes it unlawful for any person to intercept or to procure another to intercept any wire, oral or electronic communication, or intentionally use or procures another person to use any electronic communication when:

> "[Section 2511(b)(v)] such person acts in the
> District of Columbia, the Common Wealth of
> Puerto Rico, or any territory or possession of
> the United States; . . . ."   (Emphasis added.)

Thus, the question is whether or not the American Embassy in Rangoon Burma and/or Horn's U.S. Government leased residence in Burma is within the definition of territory or possession of the United States.

First, turning to 18 U.S.C. § 7, congress defined the term "special maritime and territorial jurisdiction of the United States" to include:

> "(3) any lands reserved or acquired for the
> use of the United States, and under the
> exclusive or concurrent jurisdiction thereof,

16

or any place purchased or otherwise acquired
by the United States by consent of the
legislature of the state in which the same
shall be, for their erection of fort,
magazine, arsenal, dock yard or other needful
building."

In *United States v. Erdos*, 474 F.2d 157 (4th Cir.) cert.

den'd., 414 U.S. 876, 94 S.Ct. 42 (1973) the court held that an

American citizen could be tried in the United States for

manslaughter pursuant to Title 18 U.S.C. § 1112 for killing another

American citizen in the American Embassy in the Republic of

Equatorial Guinea.  The court first held that congress, without

question, could prescribe the killing of an American citizen "by

another American citizen within any diplomatic compound located in

a foreign country. . .. [Citations omitted.]" *Id*. at 59.  In

construing Title 18 U.S.C. § 7(3)(cited above) in response to the

Defendants' claim that the section must be read "to apply only to

areas within the geographical boundaries of the United States and

may not be given extraterritorial affect" (*Id* at 159), the court

pointed out the embassy is leased to the United States from a

private citizen of Guiana and that 18 U.S.C. § 7(3) does in fact

cover an American Embassy in a foreign country acquired for the use

of the United States and under its concurrent jurisdiction. *Id* at

160.

The court in *Erdos* cited *United States v. Bowman*, 260

U.S. 94, 96-98, 43 S.Ct. 39 (1922) wherein the Supreme Court found

that both a public and a private ship on the high seas were

characterized as "'constructively' a part of the territory of the

United States." *Erdos* at 159.

> Title 18 U.S.C. § 5 states:
>
> "The term 'United States', as used in this
> Title in a territorial sense, includes all
> places and waters, continental or insular,
> subject to the jurisdiction of the United
> States, except the Canal Zone."

Certainly, the American Embassy in Rangoon Burma, and
the U.S. Government leased residence of agent Horn in Burma is
subject to the jurisdiction of the United States.

In addition, the wire tapping statutes, § 2511(b)(v)
applies to any "territory or possession of the United States".

The U.S. Supreme Court has addressed, in a similar
fashion, what is a *possession* of the United States.   In *Vermilya-
Brown Co. v. Connell,* 335 U.S. 377, 69 S.Ct. 140 (1948)  the court
held that the word "possessions" used by congress to determine
geographical coverage of the Fair Labor Standards Act included a
Bermuda military based obtained by the United States through a
lease executed with the British government.  First, the court held:

> "We have no doubt that congress has power in
> certain situations, to regulate the actions of
> our citizens outside the territorial
> jurisdiction of the United States whether or
> not the act punished occurred within the
> territory of a foreign nation.  This was
> established as to crime directly affecting the
> Government in *United States v. Bowman
> [supra]*."  *Vermilya-Brown* at 335 U.S. at 381.

Next, the court noted that the United States
Constitution, Art. IV, s 3 cl. 2, specifically placed in congress
the authorization for "needful rules and regulations respecting the

territory or other property belonging to the United States".
*Vermilya-Brown, supra*, 335 U.S. 377 at 382, 69 S.Ct. at 142-143
(1948).  The court concluded that the military base in Bermuda
leased by the U.S. Government from Great Britain was in fact a
"possession" of the United States.

Defendants make much out of the Court of Appeals cases
that have taken the position that Title III is inapplicable to
electronic surveillance abroad -- citing, *Stowe v. Devoy*, 588 F.2d
336, 341 (2nd Cir. 1978) cert den'd. 442 U.S. 931 (1979); *United
States v. Toscanino*, 500 F.2d 267, 279-80 (2nd Cir. 1974); *United
States v. Parrillo*, 34 M.J. 112 (C.M.J. 1992); *Berlin Democratic
Club v. Rumsfled*, 410 F.Supp. 144, 157 N. 6 (D.D.C. 1976), and
*United States v. Controni*, 527 F.2d 708 (2nd Cir. 1975), cert
den'd. 426 U.S. 906 (1976).  (DB at 8)

Significantly lacking in any of those cases are facts
even remotely similar to the facts here.  None of those cases dealt
with surreptitious wire tapping of an American citizen by officers
of the United States Government, <u>at an American Embassy leased or
controlled by the United States, or in U.S. Government leased
housing, over which congress obviously has control and power</u>.  They
were simply wiretaps in a foreign country, many of them having to
do with the wire taps being conducted by the foreign governments,
but in none of those cases did the wiretappings occur on U.S.
Government facilities.

19

The Defendants state (DB 9) that the Second Circuit Court of Appeals noted that there is no provision for obtaining authorization for a wire tap in a foreign country, citing *United States v. Controni*, *supra*, and *Toscanino, supra*. However, first the Fourth Amendment first requires a search and seizure to be "reasonable" something totally lacking here. Secondly, the Defendant's claim is hollow, given the fact that Executive Order No. 12333 (found at 50 U.S.C. § 401 states in § 2.3 and binding on the Defendants) that agencies within the intelligence community are authorized to collect and disseminate information concerning United States persons "only in accordance with procedures established by the head of the agency concerned and approved by the attorney general, consistent with the authorities provided by Part 1 of this Order.  Section 2.4 of that same Executive Order states that the agencies within the intelligence community "shall use the least intrusive collection techniques feasible within the United States or directed against United States persons abroad."  The same section states that:

> "Agencies are not authorized to use such techniques as electronic surveillance . . . or monitoring devices unless they are in accordance with procedures established by the head of the agency concerned and approved by the attorney general.  Such procedures shall protect constitutional and other legal rights and limit use of such information to lawful governmental purposes."  (Emphasis added.)

Section 2.5 states that the Attorney General has been delegated the power to approve for use for intelligence purposes

"within the United States or against a United States person abroad, of any technique for which a warrant would be required if under for law enforcement purposes, provided that such techniques shall not be undertaken unless the Attorney General has determined in each case that there is probable cause to believe that the technique is directed against a foreign power or an agent of a foreign power."

Significantly, Section 2.8 states that "nothing in this Order shall be construed to authorize any activity in violation of the Constitution or statutes of the United States.

The Department of Justice herein represents these two Defendants. The Department of Justice is taking an approach that should shock the conscience of this court because, what the Department of Justice is stating, is that if the tables were turned, special agent Horn, with impunity, could wire tap the offices and telephone of Brown, and the offices and telephone of Huddle and the National Security Counsel. Horn could do so with impunity, even if Secretary of State Warren Christopher dropped by Huddle's office for a private meeting, and special agent Horn could eavesdropped on conversations, or wiretapped telephone calls involving Chargé Huddle and the President of the United States. Such a narrow construction of Title 18 U.S.C. § 2511 would definitely be detrimental to the United States, and would be contrary to the intent of the Constitution and Congress.

For yet another reason why the "presumption" against extraterritoriality is not present in this case, is found in the

ARAMCO case (*EEOC v. Arabian American Oil Co.*, *supra*) where one of

the reasons for the presumption was to avoid "unintended clashes

between our laws and those of other nations which could result in

international discord."  499 U.S. at 248, 111 S.Ct. at 1230.

There would be no clash with international discord,

since the government of Burma has no interest in an American

Government agent eavesdropping on or wiretapping another American

citizen at an American Embassy or in U.S. Government leased

housing.

Defendants herein moved the Court to dismiss Count 3 of

the complaint for failure to state a claim, but the District Court

must take factual allegations of the complaint as true and resolve

any ambiguities or doubts regarding the sufficiency of the Claim in

favor the plaintiff.  *Fernandez-Montes v. Allied Pilots Ass'n.*, 987

F.2d 278 (5th Cir. 1993); *Political Action Conference of Illinois

v. Daley*, 976 F.2d 335 (7th Cir. 1992); and *Brown v. Crawford

County Georgia*, 960 F.2d 1002 (11th Cir. 1992).  *Leatherman vs.

Tarrant Co. Narcotics Intelligence and Coordination Unit, et al.*

___ U.S. ___ 113 S. Ct. 1160, 1161 (1993)

With respect to Plaintiff's allegation that the

Defendants likewise violated the Foreign Intelligence Surveillance

Act (50 U.S.C. §§ 1801 et seq. and specifically 1809 and 1810), the

same reasoning utilized above to discuss the violation of the

Omnibus Crime Control and Safe Streets Act, are pertinent herein.

Section 1801(j) of the Foreign Intelligence Surveillance Act (Title 50 U.S.C.) defines United States as meaning "all areas under the territorial sovereignty of the United States and the trust territory of the Pacific Islands."

Based upon the discussion above, the U.S. Embassy in Rangoon Burma and Plaintiff's U.S. Government leased residence, (over which certainly the United States exercises power and enforcement) should be considered the "territorial sovereignty" of the United States.

Here, there is a U.S. DEA agent stationed at an American Embassy, residing in U.S. Government leased premises, being eavesdropped upon by U.S. Government agents, with the contents of said intercepted communication being transmitted via U.S. equipment to the State Department in Washington, D.C.  Plaintiff believes that this is sufficient for an allegation under 50 U.S.C. §§ 1809 and 1810.

Based on all of the foregoing, Plaintiff has definitely stated a cause of action under the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510 et seq., because the American Embassy in Burma, and the U.S. Government leased housing for the residence of Richard Horn would be "possessions" or within the territorial jurisdiction of the United States, as explained in the cases cited above.  In addition, an adequate claim is made under the Foreign Intelligence Surveillance Act, and therefore

Defendants' motion to dismiss counts 2 and 3 of the complaint should be denied.

B.   Plaintiff Has Stated A Sufficient Claim To Maintain A *Bivens Action*.

Defendants waste a great deal of paper (DB at 9-12) discussing the standard for a heightened pleading requirement for a *Bivens* cause of action.   Then at page 13 the Defendants allege that the Plaintiff "fails to supply any specific factual allegations of when, where, by what method, or by whom this conspiracy was conceived and implemented."  This is absolutely false.

In Plaintiff's complaint, Plaintiff set forth a substantial background of Plaintiff's relationship with the two Defendants, Plaintiff's agency's relationship with the Defendants' agencies, and the reason why Chargé Huddle removed Plaintiff from the country, over the vigorous objection of the DEA.  Paragraph 13 of the complaint then specifically describes how the Defendants violated Plaintiff's Fourth Amendment rights.  The complaint specifically alleges that Huddle and Brown, or persons acting under their control "intercepted private conversation special agent Horn was having from his residence in Burma to subordinates of special agent Horn and perhaps others, according to proof.  Horn then alleges in Paragraph 13 that there was one particular interception of Horn's home telephone call to one of Horn's subordinates on or about August 12, 1993 at 11:00 p.m.  Paragraph 13 states what the conversation was about.  It further alleges that the telephone conversation was intercepted by Brown or persons acting on his

behalf and that it was recorded with the contents or the tape being made available to Huddle. Paragraph 13 then alleges that within days of the conversation "Defendant Huddle transmitted the partial contents of said conversation in a cable to Huddle's headquarters in Washington, D.C. Said cable was routed to the attention of several State Department employees most notably the EAP (East Asian and Pacific Affairs) and INM (International Narcotic Matters) divisions of DOS [Department of State]."

Paragraph 14 then describes that during that same period of time Plaintiff was communicating with his attorney in Clovis, California, his headquarters in Washington, D.C. and with other persons in Rangoon and elsewhere, and that Horn believes that those phone conversations were illegally intercepted and disclosed by the Defendants as well.

It must be remembered that all reasonable inferences must be drawn in favor of the complaint and in favor of stating a cause of action. *U.S. vs. Gaubert*, 499 U.S. 315, 327, 111 S.Ct. 1267 (1991). With respect to the allegation that Horn believed that additional phone conversations were intercepted, it is a well founded belief, since it defies common sense that Brown and Huddle would merely intercept one phone call at 11:00 o'clock at night, and not the other phone calls that agent Horn was having from his residence.

The Defendants' contention that there is no specific factual allegations of when, where and by what method, or by whom

25

the conspiracy was conceived and implemented, is nonsense. As to
who, it alleges Brown and Huddle. As to when, it certainly alleges
that during 1993, and specifically sets forth one allegation that
the illegal eavesdropping or wire tapping occurred on August 12,
1993 at approximately 11:00 p.m. (¶ 13 of the complaint also
states that the information of this phone call was placed in a
cable by Huddle and transmitted to a specific division of the State
Department in Washington, D.C. Paragraph 15 states that these
conversations were intercepted, recorded and disclosed to other
persons without the permission or the knowledge of Horn and without
any lawful authority.

Plaintiff's first cause of action (*Bivens*) and fourth
cause of action (conspiracy) incorporated by reference as though
fully set forth all of the factual allegations of Paragraphs 1
through 15.

Totally contrary to the Defendants' assertion (DB at 13-
14) the allegations in the complaint and particularly Paragraphs 13
through 15 are not conclusory allegations of unconstitutional
conduct. They are precise, they are specific, and it readily
provides the Defendants with the means to admit or deny the
allegations.

Defendants cite the case of *Martin v. Malhoyt*, 830 F.2d
237, 257 (D.C. Cir., reh'g den'd, 838 F.2d 1049 (D.C. Cir. 1987)
for the proposition that Plaintiff's allegations are conclusory and
lacks specificity. This case, however, is not only not helpful to

the Defendants, it supports the Plaintiff's allegations herein.  In
that case, the court noted that in actions against governmental
officials "plaintiffs must, at the very least, specify the 'clearly
established' rights they alleged to have been violated with
'sufficient precision to put defendants on notice of the nature of
the claim and enable them to prepare a response, and where
appropriate, a summary judgment motion on qualified immunity
grounds.' [Citations.]" *Martin v. Malhoyt, supra*, 830 F.2d at
254.  On the same page of the decision (page 254) the court
discusses the sole allegation against the U.S. Park Police Officers
in questions, and without a doubt, the allegations were conclusory,
lack specificity, and didn't give the defendants a clue as to what
they were being called upon to defend.

Did Defendants herein, or someone acting under their
control, or acting in concert with them, place any type of wire
tapping or eavesdropping device in special agent Horn's home or
connected in some manner to special agent Horn's telephone line?
Did the Defendants, or either of them, or anyone acting under their
control or supervision, or in concert with them, disclose the
contents of said telephone call to anyone else, and even more
specifically, was the contents of any eavesdropped conversation
placed in the cable that Huddle transmitted to his headquarters in
Washington, D.C., as outlined in Paragraph 13 of the complaint?

Assuming that "heightened pleading requirements" are
still required (see *Leatherman v. Tarrant County Narcotics*

27

*Intelligence and Coordination Unit*, ____ U.S. ___, 113 S.Ct. 1160
(1993); where the Supreme Court stated that heightened pleading
requirements are only required pursuant to Rule 9(b) of the Federal
Rules of Civil Procedure), Plaintiff's pleading herein is far more
than merely general or conclusory allegations.  It states when, it
state where, it states who, and by what method the Fourth Amendment
violation occurred.  It also states that the contents of said
intercepted communication was provided to at least three
individuals, Huddle, the East Asian and Pacific Affairs Division of
the State Department, and the International Narcotic Matters
Division of the Department of State.

The cases cited by the Defendants, pages 10-14 addressed
very conclusory claims, and not one of them contain the
specificities outlined in the instant complaint.

It must also be noted, that if the court believes that
more specificity is required, the detailed affidavit of Richard A.
Horn, the Plaintiff herein, which is attached hereto and marked
Exhibit "A", in opposition to the Defendants' motion for summary
judgment, provides a significant basis for allowing the Plaintiff
to amend his complaint to add more specificity in the highly
unlikely invent that more specificity is required with respect to
the instant complaint.  See *Leatherman, supra*.

In addition, and as further pointed out in the Horn
Declaration, and the Declaration of Brian C. Leighton in support of
Plaintiff's motion pursuant to Rule 56(f) of the Federal Rules of

Civil Procedure requesting this court to postpone the hearing and permitting Plaintiff to conduct discovery, that the Defendants well know, as does their counsel, of the precise allegations made by the Plaintiff herein.   The Declaration of Brian C. Leighton is attached hereto and marked Exhibit "B".

     At page 4 of the Defendants' brief, they claim that the allegations in Paragraph 13 of the complaint give rise to an inference that the conversation Horn had with another DEA agent stationed in Rangoon Burma could have come to Huddle by way of just ordinary conversations emanating from the DEA agent with whom agent Horn had the conversation in question.   <u>That is not the allegation</u>. The allegation in the complaint was that Brown, or someone acting on his behalf or under his control electronically eavesdropped on said conversation and passed said information on to Defendant Huddle, who then transmitted the contents of that conversation to his headquarters at the State Department in Washington, D.C.   Of course, with respect to a motion to dismiss, the court must except as true all of the factual allegations in the complaint. *Leatherman v. Tarrant County Narcotics Intelligence etc., supra,* ___ U.S. ___ 113 S.Ct. 1160, 1161.  See also, *United States v. Gaubert,* 499 U.S. 315, 327, 111 S.Ct. 1267 (1991).   The allegation is specifically made that Brown or persons acting under his control intercepted Horn's private conversation and provided the contents of those conversations to Defendant Huddle.   This court is

precluded, with respect to a motion to dismiss, to assume that the allegations are anything but true.

Defendants cite to the declaration of special agent Sikorra (DB at 14) but that is irrelevant to a motion to dismiss, because this court must accept the allegations in the pleading as being true. *Leatherman, supra.*

Defendants contend that the Plaintiff has "failed to plead any facts that support his theory that his communications were intercepted by an electronic surveillance." (DB at 14; emphasis in original.) What the Defendants are actually contending is that the Plaintiff must plead "evidence," but even under the heightened pleading requirements, "evidence" need not be pleaded, but facts. Plaintiff Horn alleges "facts" that his phone calls were intercepted. (Please also refer to special agent Horn's declaration attached hereto and marked Exhibit "A".)

Based on all of the foregoing, Defendants' motion to dismiss the *Bivens* cause of action and the conspiracy cause of action must be denied, even under the heightened pleading requirements. There is the "required" specificity alleged in the complaint. In the event the court deems that there is not enough specificity alleged in the complaint, special agent Horn's declaration attached hereto reveals that even more specificity can be alleged. Thus, in the highly unlikely event that the court were to dismiss the *Bivens* and the conspiracy causes of action, leave to amend should be granted.

C.   Defendants Are Not Entitled To Qualified Immunity From Suit

        The Defendants correctly set forth the test of qualified
immunity at page 15 of their brief.  There, they cite *Harlow v.
Fitzgerald*, 457 U.S. 800 (1982).  There, *Harlow* set forth that:

> "Government officials performing discretionary
> functions, generally are shielded from
> liability for civil damages in so far as their
> conduct does not violate clearly established
> statutory or constitutional rights of which a
> reasonable person would have known."  *Harlow
> v. Fitzgerald, supra*, 457 U.S. at 818.

        Again, the Defendants correctly cite the test as it has
evolved since *Harlow*, wherein a plaintiff now must demonstrate that
the defendant violated a cognizable constitutional right that was
clearly established, citing *Siegert v. Gilley*, 500 U.S. 232, 233.

        The Defendants then contend (DB at 17) that the
Plaintiff has failed to state claim under either of the statutes he
cites, 18 U.S.C. § 2520 and 50 U.S.C. § 1809.  Assuming for the
sake of argument (Plaintiff vehemently disputes the Defendants'
allegations that those sections do not apply, as stated in argument
A above), the Fourth Amendment of the United States Constitution,
as many times construed by the court applies extraterritorially
with respect U.S. Government agents violating constitutional
principles against U.S. Government citizens, as discussed below.
In addition, and importantly, the President of the United States in
Executive Order No. 12333, issued many years before the conduct in
question here, and found at 50 U.S.C. § 401 which states, in
relevant part:  (Section 2.3) that agencies within the intelligence

31

community are authorized to collect and disseminate information
concerning United States persons only if approved by the Attorney
General.  Section 2.4 of the same Executive Order states that
agencies within the intelligence community "shall use the least
intrusive collection techniques feasible within the United States
or directed against United States persons abroad."  (Emphasis
added.)  That same section states that agencies like the CIA "are
not authorized to use such techniques as electronic surveillance. .
. unless they are in accordance with procedures established by the
head of the agency concerned and approved by the Attorney General"
and that "such procedures shall protect constitutional and other
legal rights and limit use of such information to lawful
governmental purposes."

Section 2.5 of that same Executive Order states that the
Attorney General has been delegated the power to approve for use
for intelligence purposes "within the United States or against a
United States person abroad, of any technique for which a warrant
would be required if undertaken for law enforcement purposes,
provided that such techniques shall not be undertaken unless the
Attorney General has determined in each case that there is probable
cause to believe that the technique is directed against a foreign
power or an agent of foreign power.

Then, Section 2.8 of the same Executive Order states
that "nothing in this order shall be construed to authorize any

32

activity in violation of the constitution or statutes of the United States."

Before addressing the constitutional violation, it cannot be overstated that this complaint alleges an intercept of Horn's conversations, and a transmittal of the contents of those conversation by the Defendants. This is a "no brainer" for purposes of immunity. Did the Defendants do it or did they not? If they didn't do it, then "immunity" is not an issue. If they did do it, as alleged (and all of the allegations must be taken as true), did the Defendants receive authority from the Attorney General of the United States, was there "probable cause", was it done for a proper purpose, and did Brown and Huddle comply with § 3.2 which requires the Attorney General and the head of the CIA to issue "appropriate directives and procedures as are necessary to implement this order"?

Defendants acknowledge that in *Reid v. Covert*, 354 U.S. 1 (1957) the court held that wives of American servicemen living abroad could not be tried for capital crimes by military tribunals without protection of the Fifth and Sixth Amendments. Defendants acknowledge (DB at 18) that a plurality of four justices of the court rejected the claim that the United States does not need to comply with the Constitution when it acts against United States citizens abroad. The Defendants cite *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1989) (1990) (DB at 18-19) for the purported proposition that that Supreme Court case held that the

33

decision in *Reid v. Covert* is not to be read broadly.  In *Verdugo-Urquidez, supra*, the court only held that the Fourth Amendment does not apply to a search and seizure by DEA agents of property owned by a non-resident alien and located in a foreign country. *Id.* at 261-275.

The issue here is far different.  Richard Horn is not a "non-resident alien," he is a United States citizen.  Secondly, the activities of the Defendants were not simply conduct in a foreign country, it was perpetrated at U.S. Government owned or leased facilities at the American Embassy in Burma, and at Richard Horn's U.S. Government leased residence.  Agent Horn was there performing the work that he was paid to perform by the United States Department of Justice and the Drug Enforcement Administration.  As Justices Brennan and Marshall pointed out in their dissenting opinion in *Verdugo-Urquidez*, as to how they perceived the majority opinion in that case:

> "The Fourth Amendment contains no express or
> implied territorial limitations, and the
> majority does not hold that the Fourth
> Amendment is inapplicable to searches outside
> the United States and its territories.  It
> holds that respondent is not protected by the
> Fourth Amendment because he is not one of 'the
> people.'  In deed, the majority's analysis
> implies that a foreign national who had
> 'developed sufficient connection with this
> country to be considered part of our
> community' would be protected by the Fourth
> Amendment regardless of the location of the
> search.  Certainly nothing in the court's
> opinion questions the validity of the rule,
> accepted by every court of appeals to have
> considered the question, that the Fourth
> Amendment applies to searches conducted by the

United States Government against United States
citizens abroad. [Emphasis added.]  See,
e.g., *United States v. Conroy*, 589 F.2d 1258,
1264, 5th Cir., cert. den'd. 444 U.S. 831, 100
S.Ct. 60 (1979); *United States v. Rose*, 570
F.2d 1358, 1362 (9th Cir. 1978)."  *United
States v. Verdugo-Urquidez, supra*, 494 U.S. at
283, n.7, Brennan and Marshall dissenting.
(Emphasis added.)

The majority opinion in *Verdugo-Urquidez*, stated that

the words "the people," contained in the Fourth Amendment ". .

.refers to a class of persons who are part of our national

community or who have otherwise developed sufficient connection

with this country to be considered part of that community."  *Id.*,

494 U.S. at 265.

The majority in *Verdugo-Urquidez* also stated:

"The available historical data show,
therefore, that the purpose of the Fourth
Amendment was to protect the people of the
United States against arbitrary action by
their own Government; it was never suggested
that the provision was intended to restrain
the action of the Federal Government against
aliens outside the United States territory."
(Emphasis added.) *Id.*, 494 U.S. at 266.

The Supreme Court did note, however, that aliens

illegally in this country are protected under the Fourth Amendment.

*Verdugo-Urquidez, supra*, 494 U.S. at 271.  It would indeed be

duplicative to claim on the one hand that illegal aliens in the

United States have Fourth Amendment protection, but American

citizens -- particularly those preforming their jobs as Department

of Justice officials (like agent Horn) -- operating out of an

American Embassy in U.S. Government leased premises in a foreign country are not entitled to the protection of the Fourth Amendment.

The Defendants argue (DB at 21) that there are only a "few lower court cases dealing with the application of the Fourth Amendment overseas," citing *Berlin Democratic Club v. Rumsfeld*, 410 F.Supp. 144 (D.D.C. 1976). This is false. The Defendants acknowledge that that District Court Judge held in Berlin that the Fourth Amendment applied to actions by United States officials taken against American citizens overseas, at page 157 n. 6, but the Defendants attempt to distinguish that case by saying that it was decided before this *Verdugo-Urquidez* case. *Verdugo-Urquidez* does not address at all whether or not the Fourth Amendment applied to an American citizen operating overseas, nor does it address whatsoever the issue of the Fourth Amendment applying to an American citizen overseas at American Embassy or U.S. Government leased property, which certainly could be construed as "possessions" of the United States. Indeed, as stated previously, the dissenting opinion by Brennan and Marshall in that case, even states that the majority does not question the fact that the Fourth Amendment applies to searches conducted by the United States Government against United States citizens abroad. *Id.,* 494 U.S. at 283, n. 7.

Moreover, and very importantly, the Defendants completely ignore, and don't even address Executive Order No. 12333

(found at 50 U.S.C. § 401) discussed *supra* which precludes the Defendants from eavesdropping or wiretapping an American citizen.

In addition, there are a vast number of cases that state that the Fourth Amendment does not apply to actions carried out by foreign officials in their own countries enforcing their own laws, even if an American officials are present are cooperate in some degree, <u>unless American law enforcement officials substantially participated in the search or unless the foreign officials were actually acting as agents for their American counter-parts</u>. See collection of cases in *United States v. Beahtey*, 32 F.3d 503, 510-511 (11th Cir. 1994). These collection of cases are important, in that there is no question that they find the Fourth Amendment applicable if <u>American governmental officials</u> were actually the actor in the case, even if done in a foreign country, and particularly with respect to an American citizen, like agent Horn. Section 2.12 of the above described Executive Order states: "No agency of the intelligence community shall participate in or request any person to undertake activities forbidden by this Order." This Executive Order has been in place since 1981, for twelve years prior to the conduct of the Defendants in question herein.

Thus, Plaintiff has demonstrated that the Defendants violated a cognizable constitutional right that was clearly established. *Siegert v. Gilley*, *supra*, 500 U.S. at 232-232. Executive Order No. 12333 absolutely prohibits the Defendants from

37

conducting electronic eavesdropping on American citizens abroad;

and there are many appellate court cases, and at least one Supreme

Court case that apply the Fourth Amendment to conduct by U.S.

Government agents directed at American citizens overseas.   Thus,

Plaintiff has adequately alleged a *Bivens* and conspiracy causes of

action against the two Defendants and therefore Defendants' motion

to dismiss those two causes of action must be denied.

D.   Defendants' Alternative Motion For Summary Judgment Must Be
     Denied; And/Or Continued Pursuant To Rule 56(f) Of The Federal
     Rules Of Civil Procedure In Order To Allow Plaintiff To
     Conduct Discovery That Is Within The Possession Of The
     Defendants And Third Party Witnesses

     The Defendants alternatively move for summary judgment

of the causes of action in question, and particularly the *Bivens*

and conspiracy causes of action, on the grounds that even if they

cannot be dismisses as a matter of law, the undisputed facts show

that neither Brown nor Huddle, nor anyone acting under their

control engaged in eavesdropping of agent Horn's telephone calls

nor disclosed the contents of eavesdropped telephone calls.   Under

the new Rule 26(d) of the Federal Rules of Civil Procedure,

Plaintiff has been precluded, and is still being precluded from

engaging in any discovery whatsoever.   As the Declaration of Brian

C. Leighton points out, Defendants' counsel, with the U.S.

Attorney's Office (a necessary part of the Department of Justice)

refuses to stipulate to discovery, refuses to turn over the State

Department cable in question, and has even sought a gag order to

prevent the Plaintiff and Plaintiff's counsel from discussing the allegations in the complaint with any third party.

As the Declaration of Leighton points out, Leighton has heard from reliable sources that when Huddle was originally questioned about the allegations in the complaint, and the information contained in the cable referenced in Paragraph 13, Huddle exclaimed that he received the information from DEA special agent Stubbs, stationed in Rangoon, and even contacted Stubbs and sought Stubbs' confirmation of that, but that not only was Stubbs out of the country at the time, but that he never discussed agent Horn's conversation with Sikorra to anyone. In addition, the Leighton Declaration points out that Stubbs has been interviewed by Government officials but Defendants do not address this. In addition, the Leighton Declaration points out that he received information that Mary Wienhold, who agent Sikorra stated that he discussed this matter with, has also been interviewed by Government officials, but her statement is not provided by the Defendants.

As the Declaration of Horn points out, not only was Brown well equipped ████████████████████████ on Horn's residence, the only reason he had not ████████████████████

████████████████████████████████████████████

████████████████████████████████████ (Horn

Declaration at Paragraph 10)  The Declaration of Horn also points out that Brown had ████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████ (Horn

Declaration at Paragraph 11)  Brown also volunteered to both Huddle

and Horn, that the Government of Burma probably already knew about

Horn's departure from country because of a "tell tap."  (Horn

Declaration at Paragraph 14)  Horn's Declaration also points out

that Brown ███████████████████████████████████████

████████████████████████

█████████████████████████████ (Horn's Declaration at

Paragraph 13)

In response to the Declaration of Hugh Price, who claims

that his formal searches of CIA records show that there is no

evidence of any electronic surveillance on Horn, Horn's Declaration

points out that when he was interviewed by special investigator

Michael E. Grivsky of the CIA on June 12, 1994 that Grivsky

suggested that Brown may very well have employed a local Burmese

informant to initiate the illegal intercept and not gone through

official channels or utilize conventional CIA resources.  (Horn

Declaration at Paragraph 15)

Finally, and perhaps most importantly, Horn sets forth

in his declaration the fact that he telephoned Sikorra at

approximately 11:00 at night, and Sikorra was in bed; that the very

next day after his conversation with Sikorra Huddle placed in a

cable to Huddle's headquarters Horn's exact language utilized over

the telephone to agent Sikorra, which agent Horn quotes in his

declaration, and that Huddle used not only quotation marks, but
ellipsis with respect to said conversation, and then went on to
paraphrase other parts of Horn's conversation with Sikorra; that
the transmittal of that cable occurred the very next day, and at a
specific time, and that Huddle had also stated in said cable that
Horn was having "near nightly talks" with his headquarters, a fact
which is true, but which Horn never discussed with Huddle.  (Horn
Declaration at Paragraphs 2 through 8)

          Conspicuously absent from the Government's declarations
and "proof" is any disclosure of the cable in question, which
Defendants' counsel has advised Brian C. Leighton, Plaintiff's
counsel, that she has seen.  Since these documents are filed under
seal, why did not the Defendants, or their counsel, provide a copy
of said cable to this court?  To be sure, it is because if the
court saw the cable, the court would no that the contents of the
pertinent portions of the cable did not come by "word of mouth."
As Horn's Declaration points out, the wording in the cable was the
exact language spoken by Horn to Sikorra.  (Horn Declaration
Paragraph 4)

          Interestingly, the fifth paragraph of Huddle's
declaration (Exhibit "A" to the Defendants' brief) merely states:
"I learned of Mr. Horn's telephone conversation referred to in
Paragraph 13 of the complaint when informed of it by word of mouth
from employees at the U.S. Embassy Rangoon, Burma."  Conspicuously
absent from his declaration is how he was able to exactly quote

Horn's conversation when it came to him by "word of mouth," and particularly in light of Sikorra's declaration (Exhibit "C" to Defendants' brief) that he generically told Mary Weinhold, a DEA secretary, of the nature of Horn's phone call and that she should tell her husband, the Deputy Chief of Mission, Bill Weinhold. He states he doesn't know if the message was conveyed. As pointed out in the declaration of Brian C. Leighton in support of Plaintiff's motion pursuant to Rule 56(f) of the Federal Rules of Civil Procedure, Plaintiff's counsel understands that Sikorra has been interviewed and provided a statement to either DEA or the State Department.

"By word of mouth," the exact quotes as outlined by agent Horn in his declaration do not come about. particularly in light of the time of night he telephoned Sikorra, the fact that the exact quotes were included in a cable the very next day, the fact that Sikorra doesn't remember the exact conversation, the fact that he only told someone else, doesn't know whether it was passed on, the lack of a declaration from Bill Weinhold who is a State Department official, Brown's familiarity with ██████████ ████████████████████████ "wish" that he could "bug" Huddle's office, and the fact that Grivsky, a CIA IG agent told Horn that it was very possible for Brown to employ a local Burmese informant to initiate the illegal intercept and not gone through official channels or utilize conventional CIA resources, all raise not only

material issues of disputed fact, but demands discovery in this case in order to ferret out the truth.

Plaintiff herein requests the authority to engage in discovery in order to take the depositions of: (1) DEA agent Sikorra; (2) DEA agent Stubbs; (3) Mary Weinhold; (4) Bill Weinhold; (5) Defendant Huddle; (6) Defendant Brown; (7) anyone that Brown state ████████████████████████████████ ████████████████████ (8) the CIA IG investigator investigating the criminal case against Brown; (9) the State Department IG investigator who is investigating the criminal case against Defendant Huddle; and (10) any other witnesses who may have relevant information regarding the eavesdropping or disclosure of the contents of that eavesdropping information.

In addition, Plaintiff has shown the need for other discovery, including a request to see any prior statements by any witnesses, which statements were provided to CIA IG's office or the State Department's IG office, the State Department cable sent by Huddle, and received by the State Department, which must be in the State Department's possession, to which Defendant Huddle would obviously have access, to the State Department and CIA investigative files (obviously Plaintiff and his counsel would agree to any type of protective order to insure that confidential matters are not disclosed), as well as any all other cables sent by Huddle to the State Department, which could evidence additional disclosure of eavesdropped or wiretapped information.

43

"The Supreme Court has made clear that summary judgment is inappropriate unless a tribunal permits the parties adequate time for discovery." *Dunkin' Donuts of America v. Metallurgical Exoproducts Corp.*, 840 F.2d 917, 919, (1988) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 326, 106 S.Ct. 2548, 2554 (1986). See also, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n. 5 106 S.Ct. 2505, 2511 n.5 (1986). As stated in *Mattoone v. City of Pittsfield*, 980 F.2d 1, 7 (1st Cir. 1992):

> "Federal Rule 56(f) offers a 'procedural escape hatch for a party who genuinely requires additional time to martial facts essential to justify its opposition' when confronted by a summary judgment motion." [Citations omitted.] Under Rule 56(f), 'the movant must (1) articulate a plausible basis for the belief that discoverable materials exist which would raise a trial worthy issue, and (2) demonstrate good cause for failure to have conducted the discovery earlier.'" [citations.] (Internal quotations omitted.)

Plaintiff herein has demonstrated good cause for failure to have conducted the discovery earlier, as Plaintiff was precluded by Rule 26(d) of the Federal Rules of Civil Procedure, and Local Rule 206(a). Secondly, the Defendants' counsel has refused to stipulate early discovery, or to permit even the depositions of her clients.

In addition, Plaintiff has articulated a plausible basis for his beliefs that discoverable material exist which would raise a trial worthy issue. Furthermore, not only the complaint, which is incorporated by reference as though fully set forth in Horn's declaration shows the motivation, ability and access of the

44

Defendants to unlawfully eavesdrop on Horn's conversations.  Cross-examination of the Defendants, through depositions, could assist in ferreting the truth.  Did Brown ███████████████████████████████████████

█████████████████████████████████████████

Based upon the foregoing points, authorities and argument, Plaintiff's motion for Rule 56(f) relief should be granted.  A proposed order is attached to this brief.

In addition, even without a Rule 56(f) motion, Plaintiff has shown through the Declaration of special agent Horn, that there are triable issues of material disputed facts which would preclude the granting of a summary judgment motion.

IV

## CONCLUSION

Based upon the foregoing points, authorities and argument, the Declarations attached hereto, the complaint in question, the Defendants' motion to dismiss should be denied. Defendants' motion for summary judgment should be denied and/or Plaintiff's motion to deny or continue the Defendants' motion for summary judgment should be granted, in order to permit Plaintiff to conduct discovery.  In addition, Plaintiff's motion for a hearing on this matter should be granted.

Respectfully Submitted

Brian C. Leighton
(CA Bar No. 090907)
701 Pollasky
Clovis, CA  93612
(209) 297-6190

DATED:  December 12, 1994

James A. Moody
(D.C. Bar No. 294504)
2300 "N" St., NW, Suite 600
Washington, D.C.  20037
(202) 663-9011

# SECRET

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| RICHARD A. HORN, | ) | CIVIL ACTION NO. 94-1756 (HHG) |
| | ) | |
| Plaintiff, | ) | |
| | ) | **FILED UNDER SEAL** |
| vs. | ) | |
| | ) | **FILED** |
| FRANKLIN HUDDLE, JR., et al. | ) | |
| | ) | DEC 1 4 1994 |
| Defendants. | ) | |

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE EXISTS A GENUINE DISPUTE;
PLAINTIFF'S OPPOSITION TO DEFENDANTS' STATEMENT
OF MATERIAL FACTS (Loc. R. 108(h)**

Pursuant to Federal Rules of Civil Procedure, Rule 56, and Local Rule 108(h), Plaintiff hereby submits this statement of material facts as to which there exists a genuine dispute, and Plaintiff's opposition to Defendants' statement of material facts as to which there exist no genuine dispute.

1.    Plaintiff admits the allegations in Paragraphs 1 through 5 of "Defendants' Statement of Material Facts As To Which There Exists No Genuine Dispute," nut Paragraph 5 is incomplete and discussed below.

2.    Horn denies and disputes the allegations contained in Paragraphs 6 through 10 of "Defendants' Statement of Material Facts As To Which There Exists No Genuine Dispute."

3.    With respect to Paragraph 11 of the "Defendants' Statement of Material Facts As To Which There Exists No Genuine Dispute," discovery has not taken place, and therefore Plaintiff

cannot admit nor deny the information contained in said Paragraph
11 but:

      A.   Special investigator Michael E. Grivsky of the
CIA Inspector General's Office on June 12, 1994 advised agent Horn
that former Rangoon ████████████ Arthur Brown may very well
have employed a local informant to initiate the illegal intercept
and not gone through official channels or utilized conventional CIA
resources." Horn Declaration, Exhibit "A", Paragraph 15.

     As to specific statements of material facts as to which
Plaintiff contends there exists a genuine dispute, agent Horn
offers the following:

      4.   The cable referred to in Paragraph 13 of the
complaint sent by Huddle to the State Department in Washington,
D.C. precisely and exactly quoted Horn's conversation with Sikorra,
including quotation marks and ellipsis, and could not have come
through word of mouth. (Horn Declaration, Exhibit "A", Paragraphs
2-4.) [Disputing Paragraphs 6 through 10 of the Defendants'
Statement.]

      5.   Horn knew that Sikorra did not have the ability nor
was it possible for him to record the conversation Horn had with
Sikorra, and since Horn saw the cable within days after he had the
conversation with Sikorra, he immediately recognized it as being
his exact quotes. (Horn Declaration at Paragraphs 2-5.) [In
opposition to Paragraphs 6-10 of Defendants' Statement.]

6.    In a previous paragraph of the same cable transmitted by Huddle to his headquarters, Huddle also discusses "near nightly phone calls by Horn to DEA headquarters, which Horn never discussed with Huddle, and did not discuss at the Embassy. (Horn Declaration at Paragraph 8.) [In opposition to Defendants' Paragraph 6 through 10 of their statement.]

7.    Horn knew by observing the cable that Huddle's teletype was transmitted at approximately 1:35 p.m., the very next day after Horn's conversation with Sikorra. (Horn Declaration at Paragraph 6.) [In opposition to Paragraphs 6-10 of Defendants' statement.]

8.    Both Huddle and Brown had a motivation to have Horn removed from the country of Burma over DEA's objections, and had the ability to initiate eavsdropping devices on Horn's conversations. (Paragraphs 8 through 13 of the complaint, incorporated by reference in Horn's declaration at Paragraph 16 and Paragraphs 5 - 15 of Horn's declaration.) [In opposition to Paragraphs 6 through 10 of Defendants' statement.]

9.    Brown had previously stated that he wished he could "bug" Huddle's office, ███████████████████████████████████
████████████████████████████████████████     (Horn declaration at Paragraph 10.) [In opposition to Paragraphs 6 through 11 of Defendants' statement.]

10.    Brown had stated ████████████████████████
████████████████████████████████████████████████████

3

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████ (Horn Declaration Paragraph
11.) [In opposition to Paragraphs 6 through 11 of the Defendants'
statement.]

      11.   Brown stated that in March of 1993 ████████████
████████████████████████████████████████████
████████████████████████████████████████████ (Horn declaration at paragraph 13.) [In
opposition to Paragraphs 6 through 11 of the Defendants'
statement.]

      12.   After Horn had been ordered to leave to Burma by
Defendant Huddle, but before he had left, Huddle had expressed
concern that the Government of Burma would learn about Horn's
departure as a result of Huddle ordering Horn's departure, and
Brown blurted out that the "GOB probably already knew about
[Horn's] departure because of a 'teletap'."  (Horn's declaration at
Paragraph 14.) [In opposition to Paragraphs 6 through 11 of the
Defendants' statement.]

      13.   Michael E. Grivsky of the CIA Inspector General's
Office on June 12, 1994 interviewed Plaintiff Horn with respect to
the allegation of the illegal wiretap, and Grivsky advised Horn

that Arthur Brown could very well have employed a local informant
to initiate the illegal intercept and not gone through official
channels or utilize conventional CIA resources.  (Horn Declaration
at paragraph 15.) [In opposition to Paragraphs 6 through 11 of the
Defendants' statement.]

14.   Special investigator Michael E. Grivsky of the CIA
Inspector General's Office on June 12, 1994 advised Horn that Horn
and the DEA were aggrieved parties and that something should be
done to make Horn "whole."  (Horn declaration at paragraph 15.) [In
opposition to Paragraphs 6 - 11 of the Defendants' statement.]

15.   DEA Headquarters likewise believed that there was
an illegal intercept of Horn's conversations and requested the CIA
to investigate, and the State Department Inspector General's Office
is likewise investigating the allegations.  (Horn declaration
paragraph 15.) [In opposition to Paragraphs 6 - 11 of the
Defendants' statement.]

16.   Horn's phone call to Sikorra was made from Horn's
residence, which is in U.S. Government leased quarters, as was
Sikorra's residence, the telephones in those residence were
provided by the United States Government and the United States
Government paid both the phone line installation and the monthly
service charges on the telephone, and said residences were for the
use of  American Embassy personnel.  (Horn declaration at paragraph
7.) [In opposition to Paragraphs 7 - 11 of the Defendants'
statement.]

17.   Defendants have not produced the cable referenced in Paragraph 13 of the complaint.   Neither Defendant Huddle nor Defendant Brown addressed specifically the quoted portions of the cable.

18.   The exact quotes from the cable shows that the information did not come from "word of mouth" in the American Embassy, as it was the exact statements made by Horn to Sikorra and was an illegal intercept.   (Horn Declaration at Paragraphs 2-5.) [In opposition to Paragraphs 6 - 11 of the Defendants' statement.]

Respectfully Submitted,

Brian C. Leighton (CA Bar No. 090907)
701 Pollasky
Clovis, CA  93612
(209) 297-6190

James A. Moody (D.C. Bar No. 204504)
Suite 600
2300 N Street, NW
Washington, D.C.  20037
(202) 663-9011

DATED:     December 12, 1994

6

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

DEC 14 1994

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

RICHARD A. HORN,

        Plaintiff,

        v.

FRANKLIN HUDDLE, JR., et al

        Defendants.

Civil Action No. 94-1756 (HHG)
(UNDER SEAL)

## DECLARATION OF RICHARD A. HORN

I, Richard A. Horn, declare pursuant to 28 U.S.C. 1746 (2) as follows:

1. I am a Special Agent with the Drug Enforcement Administration (DEA) under the U.S. Department of Justice and have been so employed since June 1971. In succession, I have been assigned to DEA posts in Oregon, California, Pakistan, Iowa Burma and Louisiana. I am presently serving as a Group Supervisor for DEA in the New Orleans Field Division. I have been a DEA Supervisor since 1988 and have served DEA in that capacity at four different supervisory positions. I have received numerous awards and letters of commendation over my twenty-three year career with DEA. My Annual Performance Ratings have typically been in the upper two brackets, either Excellent or Outstanding. During the period in which I served as the DEA Country Attache to Rangoon, Burma, I received an Outstanding Annual Performance Rating.

EXHIBIT "A"

2.   In August of 1993 I had occasion to see a teletype that
from its format, I know was prepared by Defendant Franklin
Huddle. (I had occasion to see many teletypes from [authorized]
and sent by Charge Huddle and this teletype also stated it was
from Mr. Huddle.)I saw this cable within one to two weeks after
it was transmitted on August 13, 1993.  I know that the sixth
paragraph of Charge Huddle's cable reads exactly as follows,
including the quotation marks and ellipis:

> Finally, Horn shows increasing signs of evident strain.  Late
> last night, for example, he telephoned his junior agent to say
> that "I am bringing the whole DEA operation down here."  "You
> will be leaving with me...we'll all leave together."  In this
> context, he then went on to note talks with Green and Maher
> without explicitly drawing a connection.

3.   When I saw this cable, I knew immediately and without
question that both the information quoted, and the summarized
portion at the end of said paragraph, was based upon an
electronic intercept.  By its format, I knew that the cable had
already been transmitted to the State Department and more
specifically to EAP/TB (East Asia Pacific, Thailand, Burma)
attention John Finney, and to INM/AS Smith and Biddick
(International Narcotic Matters) attention Assistant Secretary
Grant Smith and Thomas Biddick (first names omitted on the actual
teletype).

4.   I saw the cable within days after my conversation with
DEA Special Agent David Sikorra.  The passages quoted in Charge
Huddle's cable were exactly and precisely what I had said to

Agent Sikorra.  Moreover, I knew that Defendant Huddle's analysis
of my reference to Green and Maher, which was actually based upon
several sentences of conversation with Agent Sikorra, was
startlingly accurate, ie·, "...he went on to note talks with
Green and Maher without explicitly drawing a reference."  It
should be known that Mr. Green was then Acting Administrator of
DEA and Mr. Maher was the Chief of DEA Foreign Operations, both
of whom were strongly supportive of me regarding my problems in
Burma and refused to remove me from my position there.

5.  Consistent with Charge Huddle's cable, I knew that I had
called Agent Sikorra late at night, at approximately 11:00 p.m.
Further, I knew that Agent Sikorra was in bed because he told me
so at the time of the telephone conversation.  Further, I knew it
was virtually impossible that Agent Sikorra recorded our
conversation, transcribed it or repeated it exact and verbatim to
another person and then, for it to be precisely quoted by
Defendant Huddle, all without benefit of an electronic intercept.
I also well knew I had not authorized anyone to conduct any
electronic interception of me in any form whatsoever.

6.  I knew by seeing certain data on the cable that Charge
Huddle's teletype was drafted and transmitted at approximately
1:35 p.m., the very next day after my conversation with Agent
Sikorra.  Further, I know the time of day the cable was
transmitted based upon an interpretation of certain numbers that
I saw printed on the cable.

7.  I know that Mr. Sikorra and I lived in Government Leased
Quarters (GLQ) that were but two homes of a large pool of homes

leased by the United States Government (USG) from private parties
for the use of American Embassy personnel.  Further, I know that
the telephones in these residences were provided by the USG and
that the USG paid for both the line installation and the monthly
service charges on the telephones.

8.  I also know from my personal observation that the last
sentence in Paragraph 5, the paragraph preceeding the one quoted
above in Charge Huddle's cable, reads exactly as follows:

Perhaps Horn has been simply responding to orders from DEA
Washington (there appear to be near nightly talks) to alter
tack but the net result is a sharp loss of credibility.

I was surprised to see the reference to my "near nightly" talks
with my Headquarters because I never informed Charge Huddle of
the existence of these conversations or the substance of them,
nor did I discuss nightly calls with others at the embassy.

9.  Paragraph seven of the same cable stated that the State
Department should have DEA remove me from Burma and if DEA
refused, Huddle would order my Departure.  In the end, I know
that DEA did refuse to remove me, as I was doing an outstanding
job, and shortly thereafter and over DEA's objections, Huddle
orchestrated my departure.

10. For the reasons set forth below I believe the CIA in
Rangoon and specifically, Arthur M. Brown, had the ability to
conduct electronic intercepts.  In approximately November 1992 I
had two conversations with the CIA ███████████ and Defendant
herein, Arthur M. Brown, concerning electronic intercepts.  In
the first conversation, Mr. Brown and I were seated in his office

engaged in conversation.  During this exchange, Charge "Pancho"
Huddle entered Mr. Brown's office and initiated conversation on
yet another topic.  In this context, Mr. Brown made some poignant
comments in response to the statements made by Charge Huddle.
When Charge Huddle departed, Mr. Brown commented that he sure
wished he had a "bug" in Mr. Huddle's office right now.  When I
inquired of Mr. Brown why he did not have a "bug" in Mr. Charge
Huddle's office, Mr. Brown responded that



    11. During that same month, I also discussed electronic
eavesdropping with Mr. Brown in another context.

12. Consistent with proper procedure on such matters, I drafted a cable to my Headquarters in Washington asking them to



13. In approximately February or March of 1993, I had yet another conversation with Mr. Brown concerning electronic telephone intercepts.



14. In late August or early September 1993 I had a conversation with Mr. Brown and Charge Huddle wherein the latter expressed concern that the GOB would learn of my pending departure (as a result of Huddle ordering my departure over DEA's objections). In response to this remark, Mr. Brown - very suddenly and totally out-of-synch with the conversation - blurted out that the GOB probably already knew about my departure because of a "teltap". From the context of this remark, which admittedly loses its impact when I write of it here, it sounded much like an

admission because at that time, I had already seen the August

13th cable wherein I learned I had been the subject of an

electronic intercept.  It should be known that prior to this

conversation, I had already advised ███████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

    15.  In response to DEA's call for CIA action and

investigation, I was interviewed by Special Investigator Michael

E. Grivsky of the CIA Inspector General's Office on June 12, 1994

relative to various allegations by me and my agency of unethical,

unprofessional and illegal conduct (to include an illegal

intercept) perpetrated by CIA ██████████████ Arthur M. Brown.

In this regard, I know that Mr. Maher, Chief of DEA's Foreign

Operations, had contacted the CIA Inspector General's Office

regarding the allegation of an illegal intercept and other

offenses.  (A few weeks later on July 18, 1994 I was interviewed

by an investigator from the Department of State (DOS) Inspector

General's Office relative to their ongoing criminal investigation

of the same issues.)  At one point during the lengthy interview

with Mr. Grivsky, he suggested to me that former Rangoon ████████

████████ Arthur Brown may very well have employed a local

informant to initiate the illegal intercept and not gone through

official channels or utilized conventional CIA resources.  On

another subject, Mr. Grivsky told me he thought that my agency

(DEA) and I were the aggrieved parties in this instance.  He also

said that something should be done to make me whole, a term advanced by Mr. Grivsky.

16. I hereby incorporate as though fully set forth, paragraphs 8 through 14 of my complaint filed with this Court, as the statements and allegations contained therein are true and correct, and they specifically set forth the motivation and intentions which drove Defendants Huddle and Brown to intercept my conversations.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December __9__, 1994

RICHARD A. HORN

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RICHARD A. HORN,         )    CIVIL ACTION NO. 94-1756 (HHG)
                      )
        Plaintiff,    )
                      )
    vs.              )    **FILED UNDER SEAL**
                      )
FRANKLIN HUDDLE, JR., et al.  )    **FILED**
                      )
        Defendants.   )    DEC 1 4 1994

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

**DECLARATION OF BRIAN C. LEIGHTON**
**IN SUPPORT OF PLAINTIFF'S MOTION PURSUANT TO RULE 56(f)**
**TO CONDUCT DISCOVERY PRIOR TO A HEARING ON DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

I, Brian C. Leighton, declare under penalty of perjury as follows:

1.   I'm an attorney licensed to practice law in the State of California, the Federal Courts in California, the United States Court of Federal Claims, and the Federal Circuit Court of Appeals and am one of Plaintiff's attorneys in the above entitled action, along with local counsel James A. Moody, who is licensed to practice law in the District of Columbia.

2.   I have known Special Agent Horn since approximately 1981, when Special Agent Horn was a DEA agent in the Fresno office of DEA, and I was an Assistant United States Attorney in the Eastern District of California, at Fresno. I was an assistant United States Attorney in Fresno from approximately January of 1980 through the middle of October, 1986. I was also the only attorney

EXHIBIT "B"

in Fresno assigned to the Organized Crime Drug Task Force where I
specialized in the approximate last five years of my term in the
U.S. Attorney's Office prosecuting major drug traffickers.  Special
Agent Horn and myself worked closely on many cases while I was in
the United States Attorney's Office, and we remained in contact
throughout the years after I left the U.S. Attorney's Office.  We
also remained in contact while he was stationed in Rangoon, Burma.
In approximately August of 1993 Special Agent Horn telephoned me
from Rangoon, Burma and advised me that Defendant Huddle was
removing him from his post at Burma, and he and I had many phone
calls thereafter while he was stationed in  Rangoon, Burma because
he did not depart until approximately the second week in September
of 1983.  We discussed legal strategy, we discussed his rights and
we discussed many other things over the telephone, and primarily
when he telephoned me from his residence.

        3.   He specifically described to me the cable in
question, which is referenced at paragraph 13 of the complaint.
When it was described to me by Special Agent Horn, the first thing
I remarked, is that it appears that paragraph 6 of that cable was
from a wiretap or eavesdropping device on Richard Horn's telephone
or in his residence in close proximity to the telephone.  I
specifically noted the quotation marks, the ellipsis, and the
manner in which the telephone call was described.  Based upon my
many trials as a former Assistant United States Attorney, I
certainly believed that the information contained in paragraphs

                            2

five and six of the cable was from an eavesdropping device.

4.    I immediately set about making Freedom of Information Act requests to the State Department and the CIA, as well as the Drug Enforcement Administration for information regarding the removal of Rick Horn from Burma. With respect to my FOIA request to the State Department, they acknowledged that they had a number of documents responsive to my request (which would also include the cable in question, and any and all other State Department cables referencing Agent Horn), but to date they have not provided me any documents whatsoever. They likewise have not refused to provide me any documents, but have merely stated they are still under review. My requests were sent to them approximately one year ago. The CIA's response would not confirm or deny that any documents existed, and they likewise have refused to provide me with any.

5.    In the fall of 1993, after Special Agent Horn's departure from Rangoon, Burma, I also had several conversations with DEA officials, and wrote DEA officials a number of letters regarding Horn's ouster from Burma by the State Department, and based upon those phone calls, I believe that DEA fully supports Agent Horn, and also believe that an illegal intercept of Horn's conversations occurred.

6.    I have also become aware of a State Department Inspector General's investigation of Defendant Huddle for possible criminal violations as a result of the electronic eavesdropping or

wiretapping allegations.  Indirectly through several persons, including aids at the Senate Intelligence Committee (see paragraph 9 below) it has come to my attention that not only have DEA and/or the State Department interviewed and received a statement from Special Agent Sikorra of DEA, but also of DEA Special Agent Stubbs. I have heard that Defendant Huddle had originally stated that the information contained in the cable came from DEA Special Agent Stubbs who was assigned to Burma at the time, but that Stubbs has provided information to DEA that he did not provide any information to Huddle, but instead was even out of the Country at the time. Madelyn Johnson did not deny this scenario when I confronted her with it approximately a month ago, but attributed it to Huddle's innocent error.  I believe this information is factually true even though it came to me through several distant accounts and third hand.  I have also heard that Huddle even telephoned Stubbs and attempted to persuade him that the information in the cable came from Stubbs.  I have also heard that the Inspector General's investigation of either the CIA or the State Department has interviewed Mary Weinhold, a DEA secretary, who was married to Bill Weinhold, stationed with the State Department in Rangoon, Burma relative to Horn's allegations in the complaint, yet the Defendants do not offer either her statement or her husband's statement.

7.   The Defendants' attorney is with the U. S. Attorney's Office in the District of Columbia.  She has requested this Court to issue a "gag order", precluding Agent Horn, myself,

and Mr. Moody from discussing any of the allegations in the
complaint with any third party.  Rule 26(d) of the Federal Rules of
Civil Procedure, and the D.C. local rules, preclude the Plaintiff
from engaging in any discovery at this point and time.

8.    As a result of the Defendant's filing a motion to
dismiss and a motion for summary judgment, I and Jim Moody engaged
Assistant U.S. Attorney Madelyn Johnson, who represents the
Defendants, in a telephone conversation on or about December 7,
1994 wherein we requested a stipulation to extend the time to
respond to her motion.  On Friday, December 9, 1994 she agreed to
stipulate or to voice no opposition to an extension up to and
including January 6, 1994.  However, she refused to stipulate to
allow the depositions of Huddle and Brown to be taken, she stated
that she had reviewed the cable referenced in paragraph 13 of the
complaint, but refused to produce the State Department cable in
question, she refused to stipulate to the production of the State
Department IG investigation file, she refused to stipulate to the
production of the CIA IG file, and she refused to stipulate to
engage in early disclosure of evidence and documents.

9.    I have been informed by Agent Horn that both the
State Department IG's office and CIA IG's office have interviewed
Agent Horn relative to his accusations of an unlawful eavesdropping
or wiretapping conducted by Defendant's Brown and Huddle, and I
have requested from the Attorney General's office a full
investigation of this matter, and I also understand that the House

5

Intelligence Committee and/or the Senate Intelligence Committee are also conducting an investigation relative to Horn's allegations. I know this, because the Senate Intelligence Committee requested additional information from me, after I originally sent them information, as I did the House Intelligence Committee, and I have had several conversations with aids on the Senate Intelligence committee and a knowledgeable congressman about the events in Burma and Horn's allegations.

10. As a former federal prosecutor, I understand and appreciate the distinct value of cross-examination of witnesses. Since I firmly believe that Agent Horn's telephone calls were intercepted and disclosed by the two Defendants in question, I firmly believe that permitting discovery of the State Department IG's file and the CIA IG's file relative to this incident, the depositions of Stubbs, Sikorra, Mary Weinhold, Bill Weinhold, Defendants' Brown and Huddle, Defendant Huddle's second in command Donald Jameson, Brown's second in command Jacqueline Rinn, the production of the cable, other cables from Huddle to the State Department referencing Special Agent Horn, would not only yield evidence showing the truthfulness of Horn's allegation, but would also show that Defendants' Huddle and Brown's declarations are false. I am also relying on the declaration of Plaintiff Horn attached to our opposition papers as Exhibit "A". I am certainly willing to comply with any protective order to guard against the disclosure of sensitive or classified information, and I do

6

understand what that oath entails, having been an Assistant United States Attorney and an Organized Drug Task Force Attorney for the U.S. Attorney's Office in the past.

      11. Therefore, I would respectfully request the Court, for the Court to deny the Defendant's motion for summary judgement, and issue an order (a proposed order is attached to Plaintiff's opposition) to conduct limited discovery as outlined above, and as outlined in Plaintiff's opposition to the Defendant's motion to dismiss or, alternatively, for summary judgment, before the Court entertains the Defendant's motion for summary judgment.

      I declare under penalty of perjury the foregoing is true and correct to the best of my information and belief. Dated this 12 day of December, 1994 at Clovis, County of Fresno, State of California.

Brian C. Leighton (CA Bar No. 090907)
701 Pollasky
Clovis, CA 93612
(209) 297-6190

7

## PROOF OF SERVICE BY MAIL

I declare that:

I am employed in the County of Fresno, California.
I am over the age of eighteen years and not a party to
the within action; my business address is 701 Pollasky, Clovis,
California 93612.

On December 13, 1994, I served a copy of the attached:

1.   PLAINTIFF'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE
     EXISTS A GENUINE DISPUTE; PLAINTIFF'S OPPOSITION TO
     DEFENDANTS' STATEMENT OF MATERIAL FACT (Loc. R. 108(h))

2.   PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND/OR
     FOR SUMMARY JUDGMENT; PLAINTIFF'S MOTION PURSUANT TO RULE
     56(f) OF THE FEDERAL RULES OF CIVIL PROCEDURE, REQUESTING A
     CONTINUANCE OF THE HEARING IN ORDER TO CONDUCT DISCOVERY, AND
     FOR AN ORDER PERMITTING PLAINTIFF TO CONDUCT DISCOVERY AND
     REQUEST FOR ORAL HEARING (Loc. R. 108(f)

3.   DECLARATION OF RICHARD A. HORN

4.   DECLARATION OF BRIAN C. LEIGHTON IN SUPPORT OF PLAINTIFF'S
     MOTION PURSUANT TO RULE 56(f) TO CONDUCT DISCOVERY PRIOR TO A
     HEARING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

5.   AND TWO PROPOSED ORDERS

on the interested parties herein by placing a true copy thereof in
a sealed envelope with postage thereon fully prepaid in the United
States mail at Clovis, California, addressed as follows:

          Madelyn E. Johnson
          Assistant United States Attorney
          555 4th Street, N.W. - Room 10-804
          Washington, D.C.  20001

I declare under penalty of perjury of the State of
California that the foregoing is true and correct and that this
Declaration was executed this 13th day of December, 1994, at
Clovis, California. I declare that I am employed in the office of
a member of the Bar of this Court at whose direction this service
was made.

_Kimberly R. Barker_
Kimberly R. Barker