UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

JAN 12 1995

Clerk, U.S. District Court
District of Columbia

RICHARD A. HORN,

        Plaintiff,

     v.

FRANKLIN HUDDLE, JR., et al.

        Defendants.

Civil Action No. 94-1756 (HHG)
**FILED UNDER SEAL**

DEFENDANTS' REPLY IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS OR FOR SUMMARY JUDGMENT
AND OPPOSITION TO PLAINTIFF'S MOTION PURSUANT TO
RULE 56(f) OF THE FEDERAL RULES OF CIVIL PROCEDURE

Defendants, through their undersigned attorneys, respectfully submit this reply in support of defendants' motion to dismiss or, alternatively, for summary judgment. Defendants also respond below to plaintiff's motion to stay consideration of summary judgment and to allow discovery pursuant to Fed. R. Civ. P. 56(f). For the reasons stated here, and in defendant's moving papers, the Court should deny plaintiff's request for a stay to permit discovery and should grant defendants' dispositive motion.

As defendants demonstrated in their opening brief, plaintiff fails to state a cause of action under either of the statutory bases he cites. Moreover, defendants are entitled to qualified immunity from suit in the instant case. Plaintiff's unsupported allegations are entirely without foundation. Nevertheless, assuming for the sake of argument that they were sufficient to state a cause of action, the applicability of the Fourth Amendment under the circumstances alleged here is an unsettled area of

26/27

the law and thus, under the Supreme Court's decision in <u>Harlow v.</u>
<u>Fitzgerald</u>, 457 U.S. 800 (1982), defendants are entitled to
immunity and dismissal of the Complaint.

In response, plaintiff has failed to present any legal
arguments that overcome defendants' showing that this case should
be dismissed.  Nevertheless defendants respond below.

With regard to plaintiff's request that the Court stay
consideration of summary judgment for the purpose of discovery,
it is well-established that when questions of qualified immunity
arise in the context of <u>Bivens</u>-type suits against federal offi-
cials, discovery is entirely inappropriate.  For this reason, as
well as those articulated below, the plaintiff's motion should be
denied.

ARGUMENT

> I.   DEFENDANTS' MOTION TO DISMISS
>      FOR FAILURE TO STATE A CLAIM
>      AND ON THE GROUNDS OF QUALIFIED
>      <u>IMMUNITY SHOULD BE GRANTED</u>

> A.   Plaintiff Fails To State A Claim Under
>      Either The Foreign Intelligence Surveillance
>      Act Or The Omnibus Crime Control And Safe
>      <u>Streets Act</u>

In their moving papers, defendants demonstrated that the
presumption against extraterritorial application of statutes, the
judicial interpretation given Title III of the Omnibus Crime
Control and Safe Streets Act, 18 U.S.C. §§ 2510, <u>et seq</u>., and the
language and legislative history of the Foreign Intelligence
Surveillance Act, 50 U.S.C. §§ 1801, <u>et seq</u>., make clear that
neither statute is applicable in the instant case.  <u>See</u> Defen-

dants' Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss or, Alternatively, Motion for Summary Judgment (Def. Memo.) at 5-9.  Thus, Counts II and III of the Complaint should be dismissed for failure to state a claim.

While conceding that the defendants' statement of the law is "generally true",[1] in his opposition plaintiff argues that Title III and the Foreign Intelligence Surveillance Act do apply in this case because the alleged events about which plaintiff complains occurred in the American Embassy in Rangoon, Burma and plaintiff's government leased residence.  See Pl. Opp. at 13. Plaintiff's arguments are without merit for several reasons.

First, the gravamen of plaintiff's argument is that American embassies -- and by analogy government leased housing -- are United States territory or possessions over which it exercises sovereignty.  Pl. Opp. at 16, 23.  The United States, however, has long maintained the position that while a United States Embassy abroad is inviolable, it is nevertheless situated in foreign, not United States territory.  See, e.g., 7 Whiteman-Digest, supra, at 355; 4 G. Hackworth, Digest of International Law 564-565 (1942).  The United States' position is consistent with scholarly opinion on the issue.  See, e.g., Restatement, supra, § 77, Comment (a); W. Bishop, International Law:  Cases

---

[1]   See Plaintiff's Opposition to Defendants' Motion to Dismiss and/or for Summary Judgment; Plaintiff's Motion Pursuant to Rule 56(f) of the Federal Rules of Civil Procedure, Requesting a Continuance of the Hearing in Order to Conduct Discovery, and for an Order in Order to Conduct Discovery and Request for Oral Hearing (Pl. Opp.) at 13.

and Materials 712 (3rd ed. 1967); J. Brierly, <u>The Law of Nations</u> 260-261 (6th ed. 1973).  The overwhelming weight of international authority is that Embassies cannot be considered "territory" of the sending state.

This position is also consistent with the treatment of embassies (as not being foreign territory) in other contexts, in foreign countries and in the United States.  For example, in <u>Meredith v. United States</u>, 330 F.2d 9 (9th Cir. 1964), <u>cert.</u> <u>denied</u>, 379 U.S. 867 (1965), the Ninth Circuit Court of Appeals rejected a claim brought pursuant to the Federal Tort Claims Act (FTCA) because the relevant events occurred within the physical confines of the United States embassy in Thailand.  The Court held that because the Congress intended to confine the FTCA to acts committed "within the territorial jurisdiction of the United States," the FTCA did not extend to torts committed by the United States in our embassies and consulates abroad.  <u>Id</u>. at 10-11. <u>See also</u> <u>Fatemi v. United States</u>, 192 A.2d 525, 527 (D.C. Ct. App. 1963) (embassy not extra-territorial, and could be entered by police of receiving State where inviolability is not invoked).

Second, although Congress may subject United States embassies to the jurisdiction of United States courts, and, in certain instances, those embassies may be subject to the concurrent jurisdiction of the United States and the foreign state in which they are located, Congress must express its intentions clearly. As set forth in defendants' moving papers, the Supreme Court has stated that "[w]e must assume that Congress legislates against

4

the backdrop of the presumption against extraterritoriality"
unless there is strong evidence to the contrary.  EEOC v. Arabian
American Oil Co., 499 U.S. 244, 248 (1991).[2]  Despite plain-
tiff's arguments to the contrary, neither Congress' language nor
judicial interpretation evidences any intention that either
statute at issue here should apply abroad, including within
United States embassies or compounds.

Indeed, plaintiff does not present any argument in support
of his claim that the Foreign Intelligence Surveillance Act is
applicable to an American embassy or government leased housing
abroad.  Pl. Opp. at 22-23.  As defendants have already shown,
however, in passing the Foreign Intelligence Surveillance Act
Congress explicitly stated that the Act was not intended to have
extraterritorial application and, indeed, specifically excluded
"U.S. Embassies, military bases, and other installations abroad"
from coverage.  S. Rep. No. 701, 95th Cong., 2nd Sess. (1978).
See Def. Memo. at 7-8 (citing legislative history).

With regard to Title III, plaintiff constructs an elaborate
argument that 18 U.S.C. § 2511 extends to American embassies and
government leased housing abroad because they are "possessions"

---

[2]  Plaintiff attempts to diminish the force of Aramco and
the other Supreme Court cases defendants cited (Def. Memo at 5-6
& n.2) on the theory that these cases do not specifically address
Title III or the Foreign Intelligence Surveillance Act.  Plain-
tiff's argument is disingenuous.  Even a cursory reading of these
cases illustrates that the Court's discussion begins with the
general proposition against extraterritorial application and then
focuses on the particular statute at issue.

of the United States.  Pl. Opp. at 16.  Closer scrutiny reveals,

however, that plaintiff's reasoning is flawed.

In support of this construction, plaintiff cites 18 U.S.C. §

7 and United States v. Erdos, 474 F.2d 157 (4th Cir.), cert.

denied, 414 U.S. 876 (1973).  Neither, however, are applicable

here.  Section 7 defines the term "special maritime and territo-

rial jurisdiction of the United States" for purposes of Title

18.[3]  This term, however, does not appear anywhere in the text

of Title III, or specifically section 2511.

Similarly, Erdos is not controlling because it involved the

exercise of criminal jurisdiction over a United States citizen

pursuant to an explicit statutory mandate that incorporated the

special jurisdictional grant in 18 U.S.C. § 7(3).  In Erdos, the

Fourth Circuit upheld the defendant's conviction for voluntary

manslaughter committed in an American embassy located overseas.

The court predicated its holding that the district court had

jurisdiction on 18 U.S.C. § 7 and 18 U.S.C. § 1112.  Erdos, 474

F.2d at 159.  In doing so, the court construed the statutory

---

[3]  18 U.S.C. § 7 provides in pertinent part:

> The term "special maritime and territorial
> jurisdiction of the United States", as used
> in this title, includes:
>
> (3) Any lands reserved or acquired for the
> use of the United States, and under the ex-
> clusive or concurrent jurisdiction thereof,
> or any place purchased or otherwise acquired
> by the United States by consent of the legis-
> lature of the State in which the same shall
> be, for the erection of a fort, magazine,
> arsenal, dockyard, or other needful building.

language of 18 U.S.C. § 7(3) as including American embassies abroad and held that 18 U.S.C. § 1112 was a specific grant of subject matter jurisdiction with respect to manslaughter committed at a place within the "special maritime and territorial jurisdiction of the United States".[4]  In contrast, Title III does not contain a similar grant of subject matter jurisdiction to a place within the "special maritime and territorial jurisdiction of the United States".  Thus, <u>Erdos</u> provides no guidance at all in the instant case.

Plaintiff also cites 18 U.S.C. § 5 as support for his argument that Title III extends to embassies and government housing abroad.  Section 5 states:

> The term "United States", as used in this
> Title in a territorial sense, includes all
> places and waters, <u>continental or insular</u>,

---

[4]  18 U.S.C. § 1112 states:

> (a) Manslaughter is the unlawful killing of a
> human being without malice.  It is of two
> kinds:
> Voluntary-Upon a sudden quarrel or heat of
> passion.
> Involuntary-In the commission of an unlawful
> act not amounting to a felony, or in the
> commission in an unlawful manner, or without
> due caution and circumspection, of a lawful
> act which might produce death.

> (b) Within the <u>special maritime and territorial jurisdiction of the United States</u>,
> Whosoever is guilty of voluntary manslaughter, shall be imprisoned not more than ten
> years;
> Whosoever is guilty of involuntary manslaughter, shall be fined not more than $1,000 or
> imprisoned not more than three years, or
> both.  (emphasis added).

7

subject to the jurisdiction of the United
States, except the Canal Zone.

18 U.S.C. § 5 (emphasis added).

In <u>Persinger v. Islamic Republic of Iran</u>, 729 F.2d 835 (D.C.
Cir. 1984), however, the Court of Appeals for the District of
Columbia Circuit held that similar language in the Foreign
Sovereign Immunities Act, 28 U.S.C. § 1603(c), containing the
modifying phrase "continental or insular" "is rather clearly
intended to restrict the definition of United States to the
continental United States and such islands as are part of the
United States or are its possessions" and is not intended to
include American embassies. <u>Id</u>. at 839.  The Court of Appeals
reasoned that if the definition of United States in that statute
meant all territory subject to any form of United States juris-
diction, such as embassies, the words "continental or insular"
would be surplusage. <u>Id</u>.  The same reasoning is applicable to 18
U.S.C. § 5.

Plaintiff's statutory construction is also at odds with
every case that has construed Title III.[5]  As defendants demon-
strated in their moving papers, every court that has considered
the issue has held that Title III does not apply extraterri-
torially. <u>See</u> Def. Memo. at 8-9 (citing cases).  Plaintiff fails
to name even one case holding to the contrary.  Instead, he
argues that none of the cases defendants cite dealt with wire

_____

[5] Defendants are not aware of any case that has even ad-
dressed the question of whether the Foreign Intelligence Surveil-
lance Act applies abroad and plaintiff does not cite to any.

8

tapping of an American citizen by officers of the United States government at a government facility. Pl. Opp. at 19. Plaintiff is wrong. United States v. Parrillo, 34 M.J. 112 (C.M.J. 1992), a case defendants cited, dealt with just such facts.[6]

Parrillo involved allegations of a United States Air Force investigator's unlawful interception of a telephone conversation between two active members of the Air Force while on an Air Force base in England. Id. Nevertheless, the court in Parrillo concluded that Congress did not intend that Title III have extraterritorial effect and therefor it did not apply to the alleged interception. Id. at 118.

In summary, there is no support for plaintiff's argument that American embassies and government leased housing abroad should be treated as American soil for the purpose of applying Title III and the Foreign Intelligence Surveillance Act. Accordingly, Counts Two and Three of the Complaint should be dismissed.

---

[6]  In their motion, defendants also pointed out that the presumption against extraterritorial application of Title III is also supported by the fact that the statute does not provide a mechanism for obtaining authorizations for electronic surveillance overseas. See Def. Memo. at 9. In response to this argument, plaintiff cites the wholly unrelated provisions of Executive Order No. 12333, 50 U.S.C. § 401, for the proposition that a procedure for obtaining authorization for electronic surveillance of a citizen overseas does exist. Pl. Opp. at 20. Plaintiff misses the point; Executive Order No. 12333 has nothing whatsoever to do with construing the terms of Title III to determine whether Congress intended that it apply abroad. Moreover, as discussed below, by its terms Executive Order No. 12333 does not provide plaintiff with a private right of action to enforce any obligations imposed on executive branch officials. See Exec. Ord. No. 12333, Section 3.5.

B.    Plaintiff Has Failed To Meet His Burden
      Of Demonstrating That The Alleged Acts
      Violated "Clearly Established" Cognizable
      Constitutional Or Statutory Rights

In order to overcome a claim to qualified immunity from suit in a Bivens-type action, the plaintiff must demonstrate that the defendant's alleged actions violated "clearly established" cognizable constitutional or statutory rights. Harlow v. Fitzgerald, 457 U.S. 800 (1982). Plaintiff does not dispute that he must meet this burden. Pl. Opp. at 31. In his complaint, plaintiff contends that the defendants violated plaintiff's rights under Title III and the Foreign Intelligence Surveillance Act and the Fourth Amendment. In his opposition, however, plaintiff has failed to demonstrate that these rights were clearly established.

First, even assuming for the sake of argument that the allegations in plaintiff's complaint are true, Bivens liability cannot be predicated on Title III or the Foreign Intelligence Surveillance Act. As demonstrated above, no court has ever held that either statute has extraterritorial application -- to an American Embassy, government leased housing, or otherwise. A fortiori, it cannot be said that the law was clearly established that these statutes would apply to the facts alleged in this case within the meaning of Harlow v. Fitzgerald. See also Def. Memo. at 5-9.

Second, with regard to plaintiff's constitutional claim, defendants demonstrated that Fourth Amendment application to the events alleged in the complaint is not clearly established.

10

Perhaps in recognition of this state of the law, plaintiff devotes little attention to any meaningful discussion of the contours of the Fourth Amendment rights he alleges were violated. Instead, plaintiff devotes the preponderance of his immunity discussion to a new claim, not raised in the complaint, that defendants violated Executive Order No. 12333. See Pl. Opp. at 31-38. Plaintiff's new argument that the terms of Executive Order No. 12333 provide clearly established law applicable to the instant case and pursuant to which the Court may hold defendants personally liable should be rejected.

Generally, there is no private right of action to enforce obligations imposed on executive branch officials by executive orders. See In re Surface Mining Regulation Litigation, 627 F.2d 1346, 1357 (D.C. Cir. 1980); Manhattan-Bronx Postal Union v. Gronouski, 350 F.2d 451, 456-57 (D.C. Cir. 1965), cert. denied, 382 U.S. 978 (1966); Independent Meat Packers Association v. Butz, 526 F.2d 228, 236 (8th Cir. 1975), cert. denied, 424 U.S. 966 (1976). Moreover, Executive Order No. 12333 contains an express instruction that it is not intended to confer a private right of action and states in pertinent part:

> 3.5 Purpose and Effect
>
> This Order is intended to control and pro-vide direction and guidance to the Intelli-gence Community. Nothing contained herein or in any procedures promulgated hereunder is intended to confer any substantive or proce-dural right or privilege on any person or organization.

11

Exec. Ord. No. 12333, § 3.5. Thus, even assuming that the
Executive Order can be given the same status as a statute for
purposes of Bivens analysis, an assumption that defendants do not
support, the fact that no private right of action flows from its
provisions precludes a finding of Bivens liability for any
alleged violation.

Thus, in order to survive defendants' motion to dismiss on
qualified immunity grounds, plaintiff must demonstrate a viola-
tion of clearly established law grounded in the Fourth Amendment
-- a burden that plaintiff has not met. Plaintiff generally
asserts that "the Fourth Amendment of the United States Constitu-
tion, as many times construed by the court applies extraterritor-
ially with respect [sic] U.S. Government agents violating consti-
tutional principles against U.S. Government citizens". Pl. Opp.
at 31. This level of analysis, however, is insufficient. As the
Supreme Court has observed,

> The operation of [the Harlow] standard, how-
> ever, depends substantially upon the level of
> generality at which the relevant "legal rule"
> is to be identified. For example, the right
> to due process of law is quite clearly estab-
> lished by the Due Process Clause, and thus
> there is a sense in which any action that
> violates that Clause (no matter how unclear
> it may be that the particular action is a
> violation) violates a clearly established
> right. Much the same could be said of any
> other constitutional or statutory violation.
> But if the test of "clearly established law"
> were to be applied at this level of generali-
> ty, it would bear no relationship to the
> "objective legal reasonableness" that is the
> touchstone of Harlow. . . .

12

Anderson v. Creighton, ___ U.S. ___, 107 S. Ct. 3034, 3038
(1987). Rather, Supreme Court cases establish that the right the
official is alleged to have violated must have been "clearly
established" in a more particularized, and hence more relevant,
sense. Id. And, it is in this sense that plaintiff's analysis
is most evidently lacking.

Plaintiff relies on the plurality opinion of four justices
in Reid v. Covert, 354 U.S. 1 (1957) and the dissenting opinion
in United States v. Verdugo-Urquidez, 494 U.S. 259 (1989) for the
proposition that the Fourth Amendment's application to the
instant case is "clearly established". See Pl. Opp. at 33-34.
This level of precedent is insufficient on its face to meet the
test in Harlow that "clearly established law" means that the
constitutional right must be settled, indisputable, basic and
unquestioned. See Harlow, 457 U.S. at 815, citing Wood v.
Strickland, 420 U.S. at 322. Plaintiff cites the "collection of
cases" in United States v. Beahtey, 32 F.3d 503, 510-511 (11th
Cir. 1994) in support of his contention that "there are a vast
number of cases" that would apply the Fourth Amendment to the
instant matter. Pl. Opp. at 37. Beahtey, and the four cases it
cites, however, deal exclusively with the application of the
exclusionary rule to supress evidence obtained through an over-
seas search sought to be admitted in criminal proceedings in the
United States. Thus, they do not supply any guidance in the
instant case, much less establish that the law was clearly
defined.

13

II.   PLAINTIFF'S MOTION PURSUANT TO
FED. R. CIV. P. 56(f) SHOULD BE DENIED

As set forth in defendants' moving papers and above, the
Court should dismiss the complaint for failure to state a claim
and on the grounds that the defendants are shielded from liabili-
ty by the doctrine of qualified immunity.   Nevertheless, defen-
dants have alternatively moved for summary judgment on the
grounds that there are no genuine issues of material fact and
defendants are entitled to judgment as a matter of law.   In
response, plaintiff has moved to stay consideration of the
defendants' alternative motion, for discovery pursuant to Fed. R.
Civ. P. 56(f), and for a hearing.   For the reasons discussed
below, the Court should deny plaintiff's motion.

Federal courts have broad discretion to protect a party from
undue burden or expense or otherwise to promote the ends of
justice by granting an appropriate order to limit or postpone
discovery.   See, e.g., Murphy v. FBI, 490 F. Supp. 1134 (D.D.C.
1980); Gallella v. Onassis, 487 F.2d 986, 997 (2d Cir. 1973).
Given this vast discretion, this Court "should not hesitate to
exercise appropriate control over the discovery process."
Herbert v. Lando, 441 U.S. 153, 177 (1979); see Fed. R. Civ. P.
26(c).   Accord Union of North America v. Department of Justice,
772 F.2d 919 (D.C. Cir. 1984).   It is appropriate to stay discov-
ery pending the outcome of dispositive motions, Founding Church
of Scientology v. United States Marshals Service, 516 F. Supp.
151, 156 (D.D.C. 1980), for it is simply logical that when

14

> the determination of a preliminary question
> may dispose of the entire suit, applications
> for discovery may properly be deferred until
> the determination of such questions.

O'Brien v. Arco Corp., 309 F. Supp. 703, 705 (S.D.N.Y. 1969).

Accord Panola Land Buyers Ass'n v. Schuman, 762 F.2d 1550 (11th

Cir. 1985).

Such a deferral of discovery is particularly warranted where

an action raises claims against an individually sued federal

defendant.   In the context of tort actions against federal offi-

cials, the Supreme Court frequently has admonished the lower

federal courts not to perpetuate lawsuits which, like this one,

cry out for dismissal:

> Insubstantial lawsuits can be quickly ter-
> minated by federal courts alert to the possi-
> bilities of artful pleading.  Unless the
> complaint states a compensable claim for
> relief under the Federal Constitution, it
> should not survive a motion to dismiss.

Butz v. Economou, 439 U.S. 478, 507-08 (1978); Harlow v.

Fitzgerald, 457 U.S. 808, 817-18 (1982).  Where, as here, the

complaint is against a federal official, the threshold question

of the availability of official immunity is implicated, and a

stay of discovery is virtually mandated until that question can

be resolved.

The Supreme Court has firmly established that where immunity

from suit in an individual capacity is involved, all proceedings

must await resolution of that issue.  Harlow v. Fitzgerald, 457

U.S. at 818 ("until th[e] threshold immunity question is re-

15

solved, discovery should not be allowed").  The rational for this
rule is clear:

> The [qualified immunity] entitlement is an
> <u>immunity from suit</u> rather than a mere defense
> to liability; and like an absolute immunity,
> it is effectively lost if a case is
> erroneously permitted to go to trial.

<u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526-27 (1985) (emphasis
original).  Thus, in the <u>Bivens</u> context when a claim of qualified
immunity is invoked, discovery is itself one of the burdens from
which defendants are sheltered by the immunity doctrine.  <u>Martin
v. Malhoyt</u>, 830 F.2d 237, 256-57 (D.C. Cir. 1987).  "One of the
purposes of immunity, absolute or qualified, is to spare a
defendant not only unwarranted liability, but unwarranted demands
customarily imposed upon those defending a long drawn out law-
suit."  <u>Siegert v. Gilley</u>, 500 U.S. at 232.  The Court has
therefore stressed that qualified immunity is a threshold defense
to be decided by the court before merits discovery.  <u>Id</u>. at 231.
"Until this threshold immunity question is resolved, discovery
should not be allowed."  <u>Harlow v. Fitzgerald</u>, 457 U.S. at 818.
And "[u]nless the plaintiff's allegations state a claim of
violation of clearly established law, a defendant pleading
qualified immunity is entitled to dismissal before the commence-
ment of discovery."  <u>Mitchell v. Forsyth</u>, 472 U.S. at 526.

The cases are clear that where immunity is raised in a
motion to dismiss, a district court is not free to give scant
consideration to the motion or to deny a motion for summary
judgment in favor of permitting full discovery.  Thus, until this

Court has the opportunity to rule on any immunity defenses raised in defendants' motion, no discovery should be permitted. Nor is discovery necessary for that purpose. As set forth above, even if we assume for the sake of defendants' motion to dismiss that the facts as alleged in the complaint are true, plaintiff still has not stated a cause of action or articulated clearly established law applicable to the particular circumstances alleged.

In support of his motion for discovery and in opposition to defendants' motion for summary judgment, plaintiff and his counsel, Brian Leighton, allege a number of "facts" that are simply not material to the Court's deliberations.[7] It is worth reiterating the admonition of the Court of Appeals for this Circuit with respect to pleading a Bivens claim:

> [I]n some instances, plaintiffs might allege facts demonstrating that defendants have acted lawfully, append a claim that they did so with an unconstitutional motive, and as a consequence usher defendants into

---

[7] For example, they allege that the Central Intelligence Agency had the capacity to engage in electronic surveillance in Burma. Whether this capacity existed at the time of the alleged events is immaterial to the resolution of defendants' motion. Similarly, plaintiff contends that the Department of State and the Central Intelligence Agency are conducting "criminal investigations" into the alleged actions of the defendants. Whether there are internal investigations within the various agencies is equally immaterial. See also 28 C.F.R. §§ 50.15(a)(5) & (6) (Department of Justice representation would not be authorized if an employee is the subject of a federal criminal investigation). Finally, plaintiff alleges that employees at both the Drug Enforcement Administration and the Central Intelligence Agency have indicated support for plaintiff's notion that he was subjected to electronic surveillance. As indicated in the attached declarations of William R. Piekney and James S. Milford, plaintiff is mistaken. See Exhibits A & B. Nevertheless, the personal opinions of individuals who have no first-hand knowledge is neither relevant nor material to the issues before the Court.

17

discovery, and perhaps trial, with no hope of success
on the merits.

<u>Hobson v. Wilson</u>, <u>supra</u>, 737 F.2d at 29.  Plaintiff's approach is

exactly what the Court meant to discourage in <u>Hobson</u>; he has done

nothing more than recite a series of occurrences, which could be

readily explainable with perfectly innocuous reasons, and appends

a legal conclusion that he hopes will result in the attachment of

liability.  <u>Hobson</u>, <u>Martin</u> and <u>Martin</u>, <u>supra</u>, represent a consis-

tent rejection of such a practice.

<u>CONCLUSION</u>

For the reasons stated above, and in defendants moving

papers, the Court should grant defendants' motion to dismiss or

for summary judgment and should deny plaintiffs' cross-motion

pursuant to Fed. R. Civ. P. 56(f).


                              Respectfully submitted,


                              ERIC H. HOLDER, JR., D.C. Bar #303115
                              United States Attorney


                              MADELYN E. JOHNSON, D.C. Bar #292318
                              Assistant United States Attorney
                              555 4th Street, N.W. -- 10th Floor
                              Washington, D.C.  20001
                              (202)  514-7135


18

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

JAN 1 2 1995

Clerk, U.S. District Court
District of Columbia

----------------------------------

RICHARD A. HORN

       Plaintiff,

       vs.

FRANKLIN (PANCHO)
HUDDLE, et al.,
       Defendants.

----------------------------------

Civil Action Number
94CV01756 (HHG)

DECLARATION OF WILLIAM R. PIEKNEY
CHIEF, EAST ASIA DIVISION, DIRECTORATE FOR OPERATIONS
CENTRAL INTELLIGENCE AGENCY

I, WILLIAM R. PIEKNEY, hereby declare and say:

1.  I am the Chief, East Asia Division, Directorate of
Operations (DO) of the United States Central Intelligence
Agency (CIA or Agency).  I was appointed to this position in
May 1994.  My experience in the DO spans 28 years and
includes numerous overseas assignments.  I have both
conducted and supervised human and technical clandestine
intelligence operations.

2.  As Chief, East Asia Division I report directly to
the Deputy Director for Operations, who in turn reports
directly to the Director of Central Intelligence (DCI).  I
am responsible for the CIA's clandestine intelligence



activities in East Asia.  That supervision includes ensuring that all CIA clandestine operations are consistent with law, regulation and policy.

3.  In the course of my duties I have become familiar with the above-captioned lawsuit.  It is my understanding that Richard A. Horn alleges that he was the subject of unlawful electronic surveillance conducted by a CIA employee.

4.  In my capacity as Chief, East Asia Division, I met with James S. Milford, who is Deputy Assistant Administrator, Office of International Programs,  Drug Enforcement Agency, to discuss issues surrounding counter narcotics efforts in East Asia.  That meeting was held at my offices in McLean, Virginia, at the Headquarters Building of the Central Intelligence Agency, on October 6, 1994.  During that meeting the subject of Horn's allegations was raised. Mr. Milford expressed his belief that Horn's allegations were unfounded, and that his belief was shared within the Drug Enforcement Agency.


I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge.


Executed:  6 January 1995

_____
WILLIAM R. PIEKNEY

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

JAN 12 1995

RICHARD A. HORN,
       Plaintiff,

Clerk, U.S. District Court
District of Columbia

v.

Civil Action No. 94-1756 (HHG)

FRANKLIN HUDDLE, JR., et al.,
       Defendants.

### DECLARATION OF JAMES S. MILFORD

I, James S. Milford, hereby declare the following:

1.    I am the Special Agent in Charge of the Miami Field Division, Drug Enforcement Administration (DEA). I have been with DEA as a criminal investigator since June, 1971. Prior to my current assignment, I was the Chief of DEA's Office of International Operations at DEA Headquarters.

2.    In my previous capacity as Chief of DEA's International Operations, I became generally aware that Mr. Richard A. Horn, an employee of DEA, has made certain allegations against personnel of the Department of State and the Central Intelligence Agency (CIA). I also became aware that one of the allegations made by Mr. Horn is that certain phone conversations of his were electronically intercepted while he was stationed as a DEA employee in the country of Burma (known currently known as Myanamar).

3.    I have been advised that Mr. Horn has made a representation in his ongoing legal action that DEA supports his contention that his phone conversations were intercepted while he was stationed in Burma. Based upon the information known to me,



DEFENDANT'S
EXHIBIT
NO. 3

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 12, 1995 I served a copy of

the foregoing on the following:


By first class mail, postage prepaid, to

BRIAN C. LEIGHTON
701 Pollasky
Clovis, CA 93612


JAMES A. MOODY
Suite 600
2300 N Street, N.W.
Washington, D.C.  20037

MADELYN E. JOHNSON D.C. Bar #292318
Assistant United States Attorney
555 4th Street, N.W. - Room 10-804
Washington, D.C.  20001
(202) 514-7135

2

I am unaware of any facts which would support such a statement. I am also unaware of any DEA official making a statement in support of Mr. Horn's allegations.

I declare under penalty of perjury that the foregoing is true and correct.

James S. Milford
Special Agent in Charge
Miami Field Division

This ___11___ day of January, 1995.