IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RICHARD A. HORN, | Case No. 1:94-CV-1756 RCL |
| Plaintiff, | |
| FRANKLIN HUDDLE, JR., et al., | |
| Defendants. | |

**PLAINTIFF'S MOTION TO DEPOSE FORMER STATE
DEPARTMENT IG INVESTIGATOR PAUL FORSTER IN
JACKSONVILLE, FLORIDA AT A TIME AND DATE AGREED
BY THE PARTIES OR BY FURTHER ORDER OF THE COURT**

## I. PRELIMINARY STATEMENT

On or about July 14, 1994, Plaintiff Richard A. Horn filed a complaint with the State Department Inspector General's Office regarding conduct of Defendants Huddle and Brown regarding allegations of eavesdropping and related issues while Plaintiff Horn was stationed in Burma. The matter was jointly investigated by Supervisory Special Agent of the United States State Department (hereinafter "State Department") Paul E. Forster, and CIA IG Investigator Michael E. Grivsky, commonly referred to throughout this litigation as the Joint Investigation Report. After numerous refusals by Department of Justice Attorneys to release the report, dated March 28, 1996, this Court in 2009 ordered the release of the report to Plaintiff and Plaintiff's counsel, with the CIA (hereinafter "Agency") given preliminary authority to redact portions it claims to be state secrets privileged.

As Plaintiff's counsel reported to the Court on May 19, 2009, at the status conference, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. At that May 19, 2009 hearing, this Court invited Plaintiff to file a motion to take the deposition of Mr. Forster (Reporter's Transcript at 40-41), and the undersigned stated that it would so advise the Court and file a motion when the undersigned learned that Mr. Forster was capable of proceeding with a deposition.

Within the last week Plaintiff Horn, spoke with Mr. Forster's wife and Mr. Forster, and he is ready, willing and able to do a deposition now, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Mr. Forster is willing to attend a deposition in Jacksonville, Florida, which is approximately 60

2

Case 1:94-cv-01756-RCL   Document 496   Filed 08/31/2009   Page 3 of 14

miles from his home, and where the Department of Justice has a U.S. Attorney's Office there in order to accommodate a deposition. Plaintiff proposes that the Court order a deposition be taken, with the date and time to be agreed to by the parties, with the deposition to be in Jacksonville, Florida, and if the parties cannot so agree on a date and time, the Court can order it. Mr. Forster states to Plaintiff he does not need a subpoena to be served on him in order for him to appear, as long as he knows that there is a Court order commanding his appearance at a date and time agreed to by the parties, and that it take place in Jacksonville, Florida.

At the hearing on May 19, 2009 (Reporter's Transcript at 41), Mr. Freeborne stated that he would need to know what Mr. Forster would be asked at said deposition, and the Court responded that once the Court receives the motion by Plaintiff, the Court would advise Mr. Freeborne; and the Court further stated:

> "Well, if somebody is dying, I am not going to wait for the overall resolution, but I may be able to resolve the overall thing promptly, too. I am certainly not going to wait for you guys." (RT at 41-42)

The following will report on the health and prognoses of Mr. Forster, as learned by the Plaintiff from Mr. Forster directly, and from Mr. Forster's wife, which portion Plaintiff requests remain under seal. Following that, will be a list which will encompass a number of items to which Mr. Forster can testify, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. Plaintiff's counsel will insure that Mr. Forster is provided a copy of any Court order, and Plaintiff (counsel) will then, in turn, report to the Court, whether Mr. Forster has any objections to the contents of any Court order regarding his deposition testimony.

3

It must be noted that the information contained in Part III was provided to the undersigned by Horn while Horn had a Security Clearance and the undersigned did as well; that is several years ago, and long before this Court's order of August 26, 2009. Indeed, except for this paragraph and the health update in part II below, all of this motion was prepared before the Court order of August 26, 2009.

## II. MR. FORSTER'S HEALTH

IN ORDER TO PROTECT MR. FORSTER'S PRIVACY RIGHTS, AND WHILE HE HAS AUTHORIZED THE PLAINTIFF TO PROVIDE THE COURT, GOVERNMENT'S COUNSEL AND THE TWO DEFENDANTS' COUNSEL THIS INFORMATION, HE WOULD RESPECTFULLY REQUEST THAT THIS PORTION OF THIS MOTION REGARDING HIS HEALTH REMAIN UNDER SEAL FROM THE PUBLIC.

Mr. Forster is approximately sixty-five (65) years of age. 

4



### III. THE NONINCLUSIVE TOPICS WHICH MR. FORSTER CAN TESTIFY

The following are some, but not all, of the important information to which Mr. Forster can testify, relative to both the joint investigation that he did with Mr. Grivsky of the CIA IG Office and the investigation conducted exclusively by Grivsky, which Mr. Forster believes are important in this above-entitled matter. These items are numbered for easy reference by the Court, the Plaintiff, the government and the Defendants. During some of these "bullet points" the statement is sometimes necessarily cryptic and generalized, because the Agency may otherwise contend it is classified.

1.  Throughout the investigation, Mr. Forster had numerous conversations with Plaintiff Horn, who at all times had a security clearance and was employed by DEA, in order to learn more details and specifics from Horn, and to field new information that Horn, from time to time, would provide, based upon Horn's independent conversations with others who had knowledge of the events arising out of Burma.

5

2. On occasion, Horn was also discussing matters with Michael Grivsky of the CIA IG Office, as Grivsky and Forster were conducting this matter as a joint investigation. Mr. Grivsky alone conducted an additional investigation based upon a complaint by Horn regarding actions of Defendant Brown in Burma that was not directly related to eavesdropping, but may be relevant to Brown's motive.

3. Forster's final report was re-written without his knowledge or permission, and his signature was forged, and his intended conclusions were changed. The counterfeit version of Forster's report (the one filed with the Court, and later provided to Horn and his counsel, in redacted form) depreciates and understates Forster's investigative conclusion that the information in "the cable" most likely emanated from an eavesdropping device, and that Huddle lied to Forster and others about the source of his quotes. The counterfeit report de-emphasizes the fact that Huddle attributed the quoted material to other persons, who offered powerful and convincing evidence that they were not the source. The counterfeit version also tends to "gloss-over" the powerful evidence represented by the cable itself, a "smoking gun." Forster knows with certainty the identity of the person who rewrote his report.

4. Forster knows that his handwritten authentication/authorization of the report was forged by another person who was then employed by the DOS (Department of State) IG's Office. Forster knows with certainty the identity of the person who committed that forgery.

5. Forster knows based upon his conversation with others in a position to know, that with the exception of one particular document, the DOS IG Report was classified in order to prevent Horn, his counsel, the media and U.S. Congress from gaining convenient access to it. Forster also knows from his early conversations with Michael Grivsky, his counterpart at the

6

CIA, that the CIA intended to use "the classification of documents" as the center piece of its tactics to fend off Horn's allegations. The Agency intended to prevent Horn and his counsel from gaining access to documents that would help prove their case.

6. Forster knows that his counterpart at the CIA (Grivsky) also wrote a report concerning Horn's allegations and that his report sustained Horn's allegations, which essentially was that the CIA undermined Horn's and DEA's counter drug operations in Burma, but Forster knows that Grivsky's report was re-written and the original copies recovered and then were ordered to be destroyed by an Agency supervisor. Forster knows that the conclusions in Grivsky report were changed to protect and better support the CIA and Brown who had undermined Horn and the DEA in Burma. Mr. Forster knows the identity of the person that rewrote the report, but who did not participate in the investigation.

7. Forster will testify that his counterpart at the CIA, Grivsky, stated that he and Forster were expected by their respective agencies to bury the allegations made by Horn and that they were expected to prepare a joint report that (erroneously) concluded that Horn's claims were unfounded and untrue.

8. That Robert K. Terjesen, Assistant Inspector General for Investigations at the Department of State's Office of Inspector General told Forster that Forster's career would suffer if Forster failed to do what was expected of him with respect to the Horn investigation, and what was expected of Forster was to "dump" the case and cover-up many of the true and substantial facts.

9. Forster can testify that he met with Robert K. Terjesen socially on or about June 12, 1996 at which time Terjesen told Forster that he should not bother applying for an upcoming vacancy, which would have been a promotion, because he was not considered a "team player."

10. Forster can testify that his counterpart at the CIA, Mr. Grivsky, was ostracized and otherwise punished by his superiors in the CIA in retribution for his efforts to conduct the investigation of Horn's allegations with honesty and integrity.

11. Forster will state that his counterpart at the CIA asked him to go to the Senate Select Committee on Intelligence and complain to them about how Forster's and Grivsky's investigations were being undermined by their own respective agencies, among other grievances. Forster personally made those complaints as Grivsky requested. Grivsky advised Forster that Grivsky's career would immediately suffer if he, Grivsky, made the presentation to the Senate Select Intelligence Oversight Committee.

12. Forster can testify that Robert Terjesen, Assistant Inspector General for Investigations at the Department of State, and another CIA employee, whose identity Forster knows, would regularly meet and discuss how they could manipulate the investigation and ensure that the Agencies' desired outcome (i.e., no finding in favor of Horn) was achieved.

13. At one point Horn told Forster how the audio intercept was likely conducted and where the equipment was located. The information was provided to Horn by a member of the Intelligence Community (recently retired) who has served with Horn in Burma. In response to this potentially case breaking lead, Forster's Agency told Forster that there was insufficient travel money and that Forster was not allowed to go to Burma to locate the equipment and conduct interviews until many months later; that in the interim Horn revealed his information in a

declaration submitted to the Court, which, of course, allowed the culpable agencies much time to conceal evidence and "coach" witnesses. Forster knows there was indeed funding available for Forster to travel to Burma, and that the Department of State's IG's Office has a well established procedure that can be used to expeditiously secure emergency travel funding when necessary.

14. Forster knows that the CIA prevented Forster's counterpart, Grivsky, from accompanying Forster to interview this former Intelligence Agency employee in the ▮▮▮▮. Forster knows that all of this sent the message to the employee that he was not to fully cooperate, and that in Forster's opinion, that employee did not fully cooperate.

15. Forster knows that Mr. Huddle was not asked to take a polygraph because the then Inspector General, Jacqueline L. Williams-Bridger, personally disallowed Forster from posing that question to Huddle.

16. Huddle stated in front of numerous witnesses that he frequently used quotes and ellipsis ". . . to give flavor to my cables and encourage Washington to read them." This, in Forster's opinion, is a preposterous and incredulous statement in view of what the evidence showed, to wit: Forster knows that the DOS IG's Office completed a meticulous and thorough examination of all Huddle's communications over the entire period that Huddle was in Burma. Forster knows that the DOS IG's investigation demonstrated that Huddle had lied – because no such examples of quotes were found as he claimed existed, except for the one communication at issue in this case involving Horn's conversation quoted in the cable. In addition, Forster would state that despite Forster's best efforts, Forster was not allowed to add this important material fact to the final report concerning Horn's allegations. It impacts directly on the proof of

9

eavesdropping and the credibility of Defendant Huddle. Forster knows the name of the person who prevented him from adding this important material to the final report.

17. Forster knows that Huddle's version of how he acquired the information he quoted in the cable and attributed to Horn was found to be false. Forster knows that Huddle was not investigated nor prosecuted for violation of 18 U.S.C. § 1001 (making false statements to a federal official in an investigation) in regards to his multiple false statements to Forster and others about critical details relevant to this case, even though the evidence was very compelling, and in Forster's opinion, created a substantial criminal case against Huddle.

18. Forster knows that the Department of State also has eavesdropping devices similar to those at issue in this case. Forster knows this because it was revealed to him by high level Senior Foreign Service Officer who has considerable first hand knowledge. This ranking executive shared much relevant and very specific information with Forster. Forster also spoke independently with two DS Agents who confirmed the existence of the DOS capabilities. One of them played a major role in very technical aspects of the program. The information Forster acquired from these three persons directly contradict the December 11, 1996 Declaration of Former Deputy Secretary of State Strobe Talbott filed in the class action case (later dismissed) (Case No. 1:96CV-2120000 (HHG)). Forster had occasion to read Talbott's declaration during the course of Forster's duties investigating Horn's allegations while employed as a Special Agent at the Inspector General's Office of the Department of State.

19. During the period of Forster's investigation and in the area of Washington, D.C., Forster had occasion to see the technology associated with the eavesdropping referred to above

10

and the article(s) in which DOS normally concealed it in foreign applications. Forster believes that Horn has seen the same equipment as well.

20. Forster was given much direction from his then Supervisor, Daniel Riley, which had the intended, immediate and unequivocal result of undermining Forster's investigation of Horn's allegations.

21. Forster possesses certain relevant information that impacts broadly and directly on the honesty, integrity and credibility of Daniel Riley, who was Forster's Supervisor during the period of Forster's investigation of Horn's allegations.

22. Forster knows that both Defendants Huddle and Brown were allowed to read the entire joint DOS/CIA investigative report shortly after it was filed. Forster also knows that Horn, who held a TS Security Clearance and sparked the investigation in the first place, and his attorney, who also held a TS Security Clearance, were not allowed to read the investigative report.

23. While the gist of Forster's information is stated above, he knows of much additional information, that if deposed it would be information to which he would testify, but it is additional information that has not been disclosed herein, because of possible classification issues.

### IV. PLAINTIFF'S MOTION FOR A COURT ORDER THAT A DEPOSITION CAN BE TAKEN OF PAUL FORSTER SHOULD BE GRANTED

Plaintiff's motion for the Court to issue an order that the deposition of Paul Foster can move forward in Jacksonville, Florida at a DOJ chosen office should granted. The date and time, consistent with Mr. Forster's health, and ability to travel to Jacksonville, should initially, be

worked out amongst Mr. Freeborne, Defendants' counsel, Plaintiff and Plaintiff's counsel, but it should be done and ordered to be done as soon as practical. Based upon ████████ of Mr. Foster, and his specific request, the Court should order that the parties work-out, in good faith, a date, time, place and length of said deposition, and if the parties are unable to agree, Plaintiff should be allowed to file a notice of motion on shortened and expedited basis for the Court to order the date, time, place and duration of said deposition.

Respectfully submitted.

DATED: August 28, 2009

_____
Brian C. Leighton, Lead Counsel
on behalf of Plaintiff, Richard A. Horn
BRIAN C. LEIGHTON, CA BAR #090907
Law Offices of Brian C. Leighton
701 Pollasky Avenue
Clovis, CA 93612
(559) 297-6190
Fax (559) 297-694
E-mail: kbarker@arrival.net and
E-mail: bleighton@arrival.net

12

CERTIFICATE OF SERVICE

I am employed in the County of Fresno, California, and am a member of the Bar of this Court. I am over the age of 18 years and not a party to the within action. My business address is 701 Pollasky, Clovis, California 93612. On August 28, 2009, I served the following documents on

**PLAINTIFF'S MOTION TO DEPOSE FORMER STATE DEPARTMENT IG INVESTIGATOR PAUL FORSTER IN JACKSONVILLE, FLORIDA AT A TIME AND DATE AGREED BY THE PARTIES OR BY FURTHER ORDER OF THE COURT**

By serving on the following **Via Federal Express** to:

CHRISTINE GUNNING, Court Security Officer
United States Department of Justice
United States Attorney's Office
20 Massachusetts Ave., Suite 5300
Washington, D.C. 20530

**For filing with the Clerk of the Court and service upon Defendants' and counsel in this matter as follows:**

Paul G. Freeborne - **Represents Defendant Agency - CIA**
Federal Programs Branch - Civil Division
United States Department of Justice
200 Massachusetts Avenue, NW
Room 6108
Washington, DC 20001

David Maria - **Represents Defendant Franklin Huddle, Jr.**
Donald M. Remy
Kimberly Fielding
LATHAM & WATKINS LLP
555 11th Street, NW
Suite 1000
Washington, DC 20004

Adam S. Hoffinger - **Represents Defendant Arthur M. Brown**
Robert A. Salerno
Michael V. Sachdev
MORRISON & FOERSTER LLP
2000 Pennsylvania Avenue, NW
Washington, DC 20006

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed at Clovis, California, on August 28, 2009.

Brian C. Leighton